JAMES H. WELLES *vs.* HENRY A. BAILEY AND OTHERS.

Hartford Dist., Jan. T., 1887. PARK, C. J., CARPENTER, PARDEE, LOOMIS and GRANGER, Js.

The owners of land upon a river own the soil to the middle of the bed of the river, if it is a non-navigable river, and to high-water mark if it is navigable.

These lines are not fixed ones, like the lines of ownership in lands covered by a highway, but change with the changing course of the river, where its bed changes gradually and imperceptibly.

The submerged lines are not necessarily a continuation of the upland lines from the point where they strike the river, but, in the case of non-navigable streams, run to the center line of the stream at right angles to that line, and in navigable rivers the lines to low-water mark run at the same angle.

Land not originally riparian becomes so when the river has reached it by gradually washing away all the intervening land.

And when a lot, originally not riparian, becomes so by such change of the river bed, there attach to it all the incidents of riparian land.

Among these incidents is that of the right of appropriating to itself grad-ual accretions from the river, where, by a change in the movement of its bed, it begins to recede and leave soil upon its front.

And this right of appropriation does not cease when its original limits have been restored.

The river is a natural boundary, and all rights are determined by its pres-ent relation to the land bordering upon it, where the changes in its bed have been gradual, without reference to its former relations.

This principle applied to Connecticut River, at a point where there had been great, but gradual, changes in its course through the meadows bordering upon it.

It seems that Connecticut River, between the towns of Wethersfield and Glastonbury, is a navigable river.

[Argued January 21st—decided February 28th, 1887.]

ACTION for entering upon and cutting and removing growing wood from land claimed by the plaintiff; brought to the Superior Court in Hartford County, and tried to the court, upon a defense of title in the land, before *Torrance, J.* The following agreement as to certain facts in the case was made by the counsel.

The Warwick Patent of 1631 conveyed to Lord Saye and Sele the property embraced therein, and Connecticut colony succeeded to such territorial rights as were therein granted.

The settlement of Wethersfield began in 1634, anterior to the existence of the Connecticut colony as such. Its existence as an organized township dates from 1636. For more than a year prior thereto, it, with Hartford and Windsor, then the only plantations in Connecticut, had been within the jurisdiction of Massachusetts Bay.

In 1636 those of the inhabitants of Wethersfield known as the "Proprietors," purchased from the Indians all their interest in the territory within the then township lines, comprising what was afterwards organized as the town of Wethersfield, and in 1672 a confirmatory deed was given by the Indians.

Connecticut River then was and ever since has been navigable to Hartford for large vessels, and the tide ebbs and flows therein as far up as Hartford in ordinary stages of the water.

In 1662 the Connecticut charter conveyed to Connecticut Colony the lands within its territories, subject to a paramount title in the British crown, the tenure being "a free and common socage." In February, 1685-6, the colony, pursuant to an act of the General Assembly, granted to the proprietors of the township of Wethersfield the lands within the town patent. The tenure was a free and common socage, and the paramount title was recognized as being under the charter in the crown. In 1703 the General Assembly provided that all township patents theretofore granted should be clear estates in fee simple.

At an early period there was an island in Connecticut River of about two hundred acres, known as "Wright's

Island," near the lands involved in this suit. There was a navigable channel on each side of it, and it had been long held and occupied by members of the Wright family. There was another island at or near the mouth of Roaring Brook, south of Wright's Island, known as "Brook's Island," and a small one north of the present Wethersfield cove. These were the only islands in the river in front of Wethersfield.

In 1690 Glastonbury was authorized to become a separate township, and actually became one in 1692. It was constituted from that part of Wethersfield east of the river. By common consent Wright's Island remained within the jurisdiction of Wethersfield. It is agreed that neither Wethersfield nor Glastonbury as municipal corporations ever owned any part of Wright's Island or of the land under the river.

At an early day, and prior to 1684, the lands on the east side of the river were divided among sundry inhabitants of the then town of Wethersfield in severalty. The lots were laid out three miles long and of various widths. The east ends were bounded by the wilderness or undivided land which had been previously purchased from and conveyed by the Indians in 1673 to a committee representing the inhabitants of the then town of Wethersfield, and the west ends by Connecticut River. The meadow or west end of some of said lots, and parts of Wright's Island, have remained in the possession of some families by descent from near the original settlement of the township.

In the course of time Wright's Island, by the gradual filling up of the channel to the east of it, lost its insular character, and in consequence of changes in the course of its western channel the island became parts of the main land on either side of the river. The soil of the island and of the adjacent meadows is alluvial, and the position of the bed of the river is subject to changes by addition on one side and wearing away on the other. The river bed in the vicinity of the island for a long time has shifted to the eastward and southward since the island lost its insular character and neither of its old channels has existed for many years. A

swale marks a part of the ancient east channel, and a creek occupies a part of the old west one.

In consequence of the changes in the jurisdictional line between the two townships occasioned by the changes in the river bed, Wethersfield in 1767 petitioned the General Assembly to re-establish the line, whereupon that body appointed a committee to " find and discover the place where the same originally was." At the October session, 1770, pursuant to the recommendation of the committee, the General Assembly established the following as the "jurisdiction line." " From said ancient Pewter Pot Brook's mouth running south nineteen degrees east to the north end of a fence called Josiah Benton's fence on Wright's Island, being near the middle of the bed where the river formerly ran, and then south one degree west to the great river at the south end of said island ; and the said river to the south bounds of said Wethersfield ; which line from the said Pewter Pot Brook's mouth to the south end of said island crosseth the great river aforesaid twice, and keeps on the bed of said river as the same ran when the said town of Glastonbury was set off from said town of Wethersfield."

In 1792 that part of Wright's Island then owned by James Wright was annexed to Glastonbury. This was the south part, then a part of the mainland on the east side of the river, and Wright then resided thereon. With this exception the jurisdiction line of 1770 remained as then established until 1874, when the river was made the boundary. The line of 1770 had reference to the old east channel of the river and not to the west one.

The north half of the Josiah Benton lot, so far as the record title goes, has remained in the Benton family and has descended to the defendant House as tenant by curtesy or by purchase from heirs. The south half of the lot, it is admitted for the purposes of this case only, has become, so far as the record title is concerned, the property of the defendant Trepp, and the defendant Bailey has never claimed any interest in either. This it is understood does not involve any admission by the plaintiff that either of the defendants

has any interest whatever in the land in question, or that the plaintiff is not the owner thereof.

The river at the point in question is in the form of a bend projecting into the eastern mainland. The land in controversy lies southerly and southeastwardly of a tract of land conveyed by James Wright to the ancestors of the plaintiff in 1803, part of which is now owned by the plaintiff. This tract was bounded in the deed at its southern extremity in part by Josiah Benton's land, which was then the west part of the lots now owned by the defendants House and Trepp. The north line of the Josiah Benton lot, as it was originally, would have been a continuation of the south line of the aforesaid lot extended easterly. Both these lots then had the jurisdiction line for their western boundary except when parts were under the river. In 1817 the river had worn so far to the east and south that the place where the south part of the plaintiff's lot joined the north part of the west end of the Josiah Benton lot was under the river, and the persons owning the lots respectively were riparian proprietors, as appears upon the survey in 1817 known as Wright's survey. The river continued gradually to work to the south and east, so that the place where the two lots originally joined was left on the west side of the river, and the land on which the trespasses claimed were committed would, if the river had not so changed, have been a part of the original Josiah Benton lot.

The court made the following finding of additional facts :—

In 1802 the ancestors of the plaintiff became possessed, by deed, of a tract of land, of about four acres, being the " east half " of a tract known as new-found land. This new-found land appears to have been land which had formerly been under the bed of the " east channel " mentioned in the foregoing agreed statement ; and by an exchange of deeds, made in 1803, between the ancestors of the plaintiff and James Wright, the then owner of Wright's Island, this new-found land was so divided that Wright took the west half thereof ; the then jurisdiction line between Glastonbury and Wethersfield (the middle of the extinct east channel) being the

dividing line between the parties to the deeds. In the deed of 1803, the east half of the new-found land was described as bounded "north by bounds unknown"; east by lands formerly of Ebenezer Benton, Elizur Talcott, Joseph Smith, Hosea Fox, Elijah Smith, and Jonathan Smith, partly by each; south by land of Josiah Benton (now the "Benton lot" mentioned in the statement); west by said Wright's part of the new-found land. These were the same boundary lines given in the deed of 1802, mentioned above.

When the plaintiff's ancestors took the new-found land, the east channel had long ceased to exist, and the west channel lay to the north and west of the new-found land, and occupied some of its northern end. The west channel was working its way southerly and easterly, by gradual accretions and relictions, forming the lower or down-stream section of a bend which was extending into the eastern mainland. As the channel encroached upon the new-found land from year to year, it took such a direction as to cross it, and other lands, somewhat diagonally. Wright's Island also then was, and still is, so crossed diagonally by the river.

In 1817, as shown by a survey then made, the bend had progressed so far southeasterly that the greatest part of the new-found land was under the river. A little of it had emerged on the northwest·bank of the river, and a little (the southeast corner) yet remained on the southeast bank. The northwest corner of the Benton lot was also disappearing under the approaching river. The south end of the new-found land being coterminous with the north side of the Benton lot, at the west end of the latter, the last fragment of the new-found land was covered by the river at about the same time (but a little later) that the first corner of the Benton lot was so covered.

For the same reason the first emergence of any of what was formerly the Benton lot on the northwest side of the river was nearly simultaneous with (but a little earlier than) the final emergence of the last fragment or corner of the new-found land on that side of the river. This last event occurred about the year 1850.

Since 1817 the bend in the river has continued in its progress southeasterly by gradual accretion and reliction; so that, at the date of the alleged trespasses of the defendants, about twenty acres of what was formerly the Benton lot, formerly on the east side of the east channel, and far to the east of the west channel and the new river-bed, were on the west side of the new river-bed; and the new river-bed divided, and still divides, what was formerly the Benton lot and Wright's Island, crossing them diagonally from the northeast to the southwest. The same process of the shifting of the river-bed southeasterly still continues.

The owners of Wright's Island do not claim to own any farther easterly, opposite to the Benton lot, than the jurisdiction line of 1770, being the thread of the old east channel. Excepting the parties to this suit, no other person claims to own that part of what was formerly the Benton lot adjoining the east side of Wright's Island. In 1817 the spot where the southeast part of what was formerly the new-found land joined the northwest part of what was formerly the Benton lot, was in the bed of the river. By gradual accretion to that part of the plaintiff's land then on the west bank of the river, it has gradually increased from year to year, until by the gradual change of the river the land in question, which was formerly part of the Benton lot, has appeared on the west side of the river.

The defendants claim that, notwithstanding the changes in the position of the river's bed, they still hold and own that part of what was formerly the Benton lot now on the west or northwest side of the river, being that part thereof whereon the alleged trespasses were committed. The plaintiff, on the other hand, claims that, by operation of the law of accretion, the part so cut off by the river, together with other lands above and below the Benton lot, has accrued to and belongs to him, as the owner of the tract of new-found land.

The alleged acts of trespass done by the defendants were the felling and removal of poplar trees, standing and growing on a region several acres in extent, about midway

between what was formerly the west end of the Benton lot and the river. None of the trees were on the new-found land lot; and the defendants, so far as they could determine the northern limits of the Benton lot without an actual survey, took only such trees as were within the limits of what was originally that lot, under a full belief that in law they were the owners of the trees. The trees were of the first growth on the ground since its emergence on the west side of the river, and were, in fact, the only vegetation of any kind which had been taken from the ground so cut over by any one. As the land which was formerly the Benton lot emerged on the west side of the river, it was so sandy as to be unfit for cultivation, and gradually was covered with poplar trees and willow bushes, and most of it has since so remained. A piece of one half acre in the northwest corner, however, was many years ago cleared and laid down to grass, which has been annually cut by the plaintiff or his predecessors, or Mr. Goodwin, for more than fifteen years before the bringing of this suit.

In relation to the claim of title in the plaintiff by adverse possession, I find the following facts at the request of the defendants:— (This part of the finding is omitted, as the case was decided in this court on other grounds.)

The plaintiff claimed to have proved title to the premises in question, both by accretion and by adverse possession, and the defendants denied that the plaintiff had such title in either way.

The court held, on the foregoing facts, that the plaintiff had title to and possession of the premises in question, both by accretion and by adverse possession, and that the defendants had committed the trespasses claimed, and rendered judgment that the plaintiff recover of the defendants two hundred and nine dollars, being the value of the trees cut, as they stood, and costs.

Upon the trial of the cause the defendants claimed as matter of law upon the above facts:—1. That the deed given by James Wright, of "the new-found land," to Samuel Welles and others, in 1803, under which the plaintiff claims,

conveyed a limited and not a riparian grant. 2. That if at any time after the date of that deed the waters of the river temporarily submerged the whole or any part of the granted land, its owners thereby became riparian proprietors only to the extent of such submergence, within the original boundaries of the land, and entitled to only such accretion as should attach to the original grant limited within its original boundary lines. 3. That if the right to accretion at any time attached to the grant so as to extend the new-found land in any direction beyond any of its exterior lines, it so attached only to one side of the grant upon its river front, and within its terminal lines projected into the river, and not across the terminal lines so as to embrace any portion of the original lands of the defendants adjoining on the south. 4. That the temporary submergence of the lands of the plaintiff and of the defendants by the constant shifting of the river channel effected no change of title to the lands. 5. That the defendants, as well as the plaintiff, could regain their lands within their original boundaries, if they could be ascertained, when the lands emerged from the waters of the river, whether such emergence was due to accretion or reliction. 6. That the various acts of occupation claimed by the plaintiff were not admissible in evidence, because they were not open, notorious, continuous or exclusive, and were not brought home to the knowledge of the defendants; and, if admissible, that they did not constitute adverse possession.

The court overruled these claims, and rendered judgment for the plaintiff. The defendants appealed.

*R. Welles* and *S. W. Adams*, for the appellants.

The plaintiff, in order to lay the foundation for making the claim by accretion, put in evidence a deed given by James Wright, in 1803, to Samuel Welles and others, of a tract of land immediately adjoining the *locus in quo* on the north. The land was the east half of what had been the bed of the east channel of the river at that point, which had been filled up so as to become a low swale. The tract is

bounded, north on "lands unknown," east on certain up-
land proprietors, south on "land of Josiah Benton in part,"
and west on land of James Wright, the grantor. The plaint-
iff claims this tract as a descendant of Samuel Welles,
while the defendants claim the Benton lot, adjoining on
the south, which is the *locus in quo*, as descendants of
Josiah Benton and successors to his title. But the Welles
lot and the *locus in quo* are flats, formed by the filling in of
the ancient channel, and both had the town line between
Wethersfield and Glastonbury as their west line, which was
established in 1770 as the center of the east channel, as
the river ran in 1692.

1. The plaintiff's grant is not riparian.—(a) It is a
grant of flats. While a flat may become attached to the up-
land by accretion, we submit that it is going too far to claim
that one flat may become attached to another flat by accre-
tion. We have found no authorities to sustain such a view of
the law. Especially is this so when the two flats are on the
same side of the river—the Benton lot being down stream
from the Welles lot.—(b) This grant is bounded on all
sides by the lands of others. The river is not mentioned as
a boundary, which shows it was not the intent of the parties
to make the river a boundary, and therefore the grant was
not riparian. It is what is called a limited grant. Such a
grant is thus described in Houck on Rivers, § 252:—"A
limited field (*ager limitatus*) is a tract of land conveyed by
artificial lines of mensuration or by fixed boundaries, whether
the contents be set forth or not." The same author, in § 256,
after quoting from Niebuhr on the Roman Land Law as to
some peculiarities of limited fields, ends the quotation in
these words: "In other respects the limited fields had
certain legal peculiarities, concerning which scarcely any
other express statement is presented *than that they had no
right to alluvial land.*" Bracton, Bk. 2, ch. 2, sec. 1. In Gould
on Waters, § 195, it is said—"The legal effect of the con-
veyance is determined by the terms employed." And the
boundaries in the deed are held to determine whether the
grant is riparian or not. *Mill River Co.* v. *Smith,* 34 Conn.,

463; *N. Hav. Steamboat Co.* v. *Sargent*, 50 id., 203; *Dunlap* v. *Stetson*, 4 Mason, 365; *The Schools* v. *Risley*, 10 Wall., 110; Britton, p. 86*b*.—(c) The river was not in fact a boundary of the plaintiff's grant in 1803. Gould on Waters, §§ 148, 149.

2. The subsequent submergence of the two tracts of land for a few years effected no change in the title to the lands. It will be admitted that a temporary submergence will not effect any change of ownership. The annual floods of this river are familiar examples of this truth. When does a submergence cease to be temporary and begin to be permanent? Where is the line to be drawn? No limit of time has ever been fixed. Practically there is no limit. In the late case of *Mulry* v. *Norton*, 100 N. York, 424, which in some important respects is similiar to this, RUGER, C. J., in the course of a well-considered opinion, says (p. 434):—"It is not, however, every disappearance of land by erosion or submergence that destroys the title of the true owner, or suffices to enable another to acquire it, for the erosion must be accompanied by a transportation of the land beyond the owner's boundary to effect that result, or the submergence followed by such a lapse of time as will preclude the identity of the property from being established upon its reliction. Neither does the lapse of time during which the submergence continued bar the right of such owner to enter upon the land reclaimed and assert his proprietorship. Ang. Tide Wat., 77, 80, and cases cited." Gould on Waters (§ 158) states the circumstances under which land may be wholly lost as follows:—"But if the sea gradually and imperceptibly encroach upon private lands, or the bounds are lost, and the situation and extent of the lost land cannot be ascertained, it belongs to the crown at common law, and in this country to the state." But it is evident that this state of facts does not exist in the case of our lands, which are well known. The rule is stated in Houck on Rivers, § 258, referred to in the above opinion in *Mulry* v. *Norton*, as follows:—"Nevertheless, it is possible that by the action of the sea, or a change of the channel

of a river, the land so granted may be partly lost. No doubt in case afterwards the land should be washed up again, it would belong to the former owner, to the extent originally purchased, and no further." The right of ownership of soil under the Connecticut River was early recognized by this court. In the case of *Adams* v. *Pease,* 2 Conn., 483, the soil under the river at Suffield above the ebb and flow of the tide was held to belong to the plaintiff to the middle of the river. In the case of *Town of Middletown* v. *Sage,* 8 Conn., 221, the title to the bed of the river at Middletown, where the tide ebbs and flows, was held to be *primâ facie* in the state, but only *primâ facie.* BISSELL, J., says :—" The island in question, being formed upon the bed of a navigable river, the title is *primâ facie* in the state." Lord HALE says : —" As touching islands, arising in the sea, or in the arms or creeks or havens thereof, the same rule holds, which is before observed, touching acquests by the reliction or recess of the sea, or such arms or creeks thereof. Of common right and *primâ facie* they belong to the crown; but where the interest of such *districtus maris,* or arm of the sea or creek or haven, doth, in point of propriety, belong to a subject, either by charter or prescription, the islands that happen within the precincts of such private propriety of the subject will belong to the subject, according to the limits and extent of such propriety." In the case of *Browne* v. *Kennedy,* 5 Har. & Johns., 195, BUCHANAN, J., says :—" If one has an estate through which a private river runs, and an island should arise in the river, it will belong to him; so if he has the property in the soil of a public river, and an island springs up, it will equally belong to him. And for the same reason all islands, relicted land, and other increase arising in navigable rivers, belong in England to the king; here, to the state, *where the property to the soil has not been appropriated ;* but where it has become private property, either by grant or prescription, the same rules do or should apply to it that govern other private property of the same nature." In Phear on Waters, cited in Houck, p. 169, note 1, the principle is laid down thus :—" It need hardly be added that, if

an island makes its appearance, it is the property of the person, whether king or subject, to whom the soil *on which it rests belonged*." This principle was held to apply to, and vest in the state, an island emerging in the navigable waters of the Thames, by this court in *Tracy* v. *Nor. & Wor. R. R. Co.*, 39 Conn., 382. In the case of *Mayor &c. of Mobile* v. *Eslava*, 9 Porter, 577, COLLIER, C. J., says (p. 591):—" The king may grant the soil of tide-waters to an individual, yet the grantee cannot so exercise his right of property as to injure the paramount right of navigation. All, however, agree, that as the shore becomes derelict by the receding of the waters, he may appropriate it to private purposes." In Bac. Ab., *Prerog.* (*B.*) *1*, it is said:—" If land be drowned, and so continue for divers years, if it be after regained, every owner shall have his interest again, if it can be known by the boundaries." In Com. Dig., *Prerog.* (*D.*) 62, it is said: —" But if the sea overflows the land of any person, and after forty years flows back again, the owner shall have the land, and not the king." It does not take forty years for the Connecticut River to shift its whole width. The river Severn in England was similar to it in the shifting of its channel. But though called "a wild, unruly river" by Lord HALE, yet the principle we contend for was applied to the owners of the soil. The case establishes the principle that when an unruly navigable river shifts its channel and inundates the land of a private owner, the property of the soil is not lost to the owner, though it come out on the other side of the river, and then is thrown back again where it was at first. It also establishes as a corollary to this principle, the further consequence that the sovereign gains no right to the soil by the inundation; in other words, the inundation affects the rights of neither subject nor sovereign. Lord Barclay claimed the land where the channel of the Severn once ran, because it was a part of his manor. So we claim the *locus in quo*, as part of the Benton lot, owned by us and our grantors. " The river of Severn had gained upon Shinbridge so much that its channel ran over part of Shinbridge lands and lost part thereof unto the other side,

and then threw it back again to Shinbridge. It shall not belong to Aure. Neither was it at all claimed by the king, though Severn in that place be an arm of the sea. But it was restored to Shinbridge as before. It is true here were the old bounds or marks continuing. But suppose the inundation of the sea deface the marks and boundaries, yet if the certain extent or contents from the land not overflown can be evidenced, *though the boundaries be defaced, yet it shall be returned to the owner according to those quantities and extents that it formerly had.*" Hale's De Jure Maris, 16. Again, in the case of the prosecution against Smith, it appeared " that Severn in the place in question was an arm of the sea, flowed and reflowed with salt water, was within and part of the ports of Bristol and Gloucester, and that within time of memory these were lands newly gained and inned from the Severn ; and that the very channel of the river did, within time of memory, run in that very place where the land in question lies ; and that the Severn had deserted it, and the channel did then run about a mile towards the west." The defendant claimed it as a parcel of the manor of Barclay, and so proved it that the prosecution was abandoned, after which, it is said, the lands were " enjoyed by the Lord Barclay and his farmers quietly and without the least pretense of question to this day." Id., 34. See also 2 Black. Com., 261. Ejectment will lie for land covered with water. Gould on Waters, § 471. Also trespass. 1 Chitty Pl., 174. In the recent case of *Rose* v. *Luddington*, 51 Conn., 185, PARDEE, J., says :—" To encourage the planting of oysters the state has assigned portions of the bed of Long Island Sound to private and exclusive ownership." It is no objection to this grant that it is covered permanently by the Sound. How can it be an objection to our grant that it has become temporarily covered ? The rate of progress of the river· channel to the eastward, over the Benton lot, since 1802, has been such that, as is apparent by a glance at the map or survey, the river has shifted its bed in that direction about *four times its own breadth*, and three times its breadth since 1817. The rate of progress has

been from *one to two rods per year*. And the new land forming or re-appearing on the west side of the river has kept pace with the amount annually worn away on the east side. This is what the court below has labeled "gradual accretion." And the process is still going on. It is only a question of time when, if the plaintiff's claim be allowed, he or his successors will have got possession of all the meadows southerly to Rocky Hill. Already his five acres have grown to about eighty, if the law is as he claims it to be. It cannot be claimed that this constant loss of land on one side, and corresponding growth on the other side, goes on day by day and is imperceptible. This court knows, just as well as if it were so stated in the finding, that it does not go on at all in the winter season, when the river is bound with ice as with fetters of iron. It also knows, without being so informed by the court below, that this tremendous wear and tear on the one side, and upheaval on the other, occurs only during the spring and other freshets. And even if the steep alluvial bank of the east side is also undermined by the "swash" of passing steamboats, or the current of the stream is diverted by the stone piers which are placed in the river for the improvement of navigation, all these causes are not the "natural and ordinary" incidents of a water-course. Since about 1845 some twenty acres of our land have become transferred to the west side of the river. And yet the grand result of all these violent agencies, by which we are losing about one half of an acre annually, is claimed to constitute a case of "gradual accretion." We claim it is rather a "series of *avulsions*," if there ever was one. See *Perry* v. *Pratt*, 31 Conn., 435–7 and 442–3, where that term is applied to a "gradual" change in the channel of a creek, through a long series of years. According to Judge SWIFT, the principles involved in this case have already been decided and adopted in this state in accordance with our claims. He says:—"A principle has been adopted in this state that where a navigable river has gradually shifted its whole bed, so that a man's land has risen on the opposite side, he is entitled to it. Connecticut River is constantly varying its

channel; and instances have occurred within the memory
of man where the soil has re-appeared within the original
bounds of a proprietor on the opposite bank of the river.
Where it has been practicable to prove the fact, such pro-
prietors have been able to assert and enforce their claims
and recover the land." 1 Swift's Dig., 111. This principle
was adopted as early as September, 1789, by our Superior
Court, then the highest court in the state, (the judges of the
court being Richard Law, Eliphalet Dyer, Andrew Adams,
Jesse Root and Charles Chauncey, all eminent jurists in that
day) in the case of *James Wright* v. *Josiah Robbins et al.,*
which involved the title to land which had formerly belonged
to certain Wethersfield proprietors on the west side of this
same river, but which had come out on the east side of the
river at the south end of Wright's Island. The plaintiff
claimed the land as the owner of Wright's Island, while the
defendants claimed it as the owners of the lots within
whose original bounds this new-made land had emerged.
At the March term, 1789, the whole question involved in
this and three other suits, between substantially the same
parties, was referred by agreement to Erastus Wolcott, John
Treadwell and Roger Newberry, to report at the next term
of court. They reported an award in favor of the Wethers-
field proprietors, adjudging them the land in dispute as
included in their original bounds, which report was accepted
by the court. This settled the common law of Connecticut,
and it has remained as then settled nearly a hundred years,
governing the titles to real estate, laying down a property
rule which has received the sanction of riparian proprietors
on both sides of this shifting river, until the decision of this
case in the court below, which reverses this first rule, and
punishes the defendants for their acts in accordance with it,
while it rewards the plaintiff for doing the same thing. The
plaintiff claimed his land when it came out on the opposite
side, though if he is right in his claim now made his land
when it emerged on the west side went by accretion to the
Wethersfield proprietor, but the latter, a descendant of
James Wright, did not claim it. If he had done so he

would have violated the law as settled in 1789. He, as well as the defendants, suffer for abiding by the law. This common law of this state has been upheld in the Superior Court ever since 1789, whenever a case has arisen involving the principle, until now. One such case is related in Barber's Hist. Collections, 113. See also Angell on Watercourses, § 57, note 4. This principle as thus established in this state had then and has now the highest authority in its support. The rule is comprehensively laid down by Lord HALE, in De Jure Maris, *pars prima, cap.* 1, (Hargrave's Law Tracts, p. 5,) as follows :—" If a fresh river between the lands of two lords or owners do insensibly gain on one side or the other side, it is held, 22 Ass., 93, that the propriety continues as before in the river. But if it be done sensibly and suddenly, then the ownership of the soil remains according to the former bounds. As if the river running between the lands of *A* and *B* leaves its course, and sensibly makes its channel entirely on the lands of *A*, the whole river belongs to *A; aqua cedit solo*; and so it is, though if the alteration be by insensible degrees, but there be other known boundaries, as stakes or extent of land. 22 Ass. pl., 93. And though the books make a question whether it hold the same law in the case of the sea or the arms of it, yet certainly the law will be all one, as we shall have occasion to show in the ensuing discourse." And see further, Id., cap. 6, (Hargrave's Tracts, p. 32). We call attention to the third clause of this citation, and to its agreement with a previous citation from him relative to the river Severn. In the case of *Ford* v. *Lacey*, 30 L. Jour., Exch., 351, decided in 1861, the plaintiff's land was originally on the east side of the river Lee, but portions of it had come out on the west side. The plaintiff brought suit, claiming as his the land which had emerged, because it had come out on the other side within his ancient bounds. The defendant claimed it by accretion. In the court below the jury rendered a verdict for the plaint-iff. In the appellate court all the judges agreed that the above passage cited from Lord HALE stated the law correctly. POLLOCK, C. B., said :—" The presumption of law

which arises as to the ownership of land left dry when the river recedes, does not arise when there is any positive evidence of ownership. A mere legal presumption is the weakest of all titles, for it is displaced by the slightest amount of evidence that a jury will believe." In the case at bar the defendants have the most "positive evidence of ownership" of the land in dispute; indeed their complete record title thereto is fully admitted. Not a case has been found where a river has shifted its whole width and land has come out on the other side but that it has been adjudged to the original owner. We claim the. application of the same rule to this case. It will give to each his own, and make a man's title to his land as permanent as the solid foundations of the earth. By the application of the law of accretion you take from the defendants their ancestral acres, and give them to the plaintiff without compensation, and make the title to land as "unstable as water." If the decision of the court below stands, the plaintiff's tract of four acres will increase in geometrical progression as the years roll by and the river rolls on.

3. There can be no accretion across dividing lines. If the plaintiff is entitled to accretion at all, all the rules relative to the division of alluvion were disregarded, and the plaintiff was allowed to have the increase to his land, across the line of his adjoining proprietor down stream, even to the extent of swallowing it up entirely. The general rule is thus stated in Gould on Waters, § 163:—" When the general course of the shore or river bank approximates to a straight line, alluvial deposits, as well as flats, are divided among the coterminous proprietors by lines perpendicular to the general course of the original bank, or of the original high-water mark of the shore." The plaintiff's land lies in the form of a parallelogram, its east and west lines marking its sides, and its south terminus the line dividing his tract from ours. A line drawn " perpendicular to the general course of the original bank," from the southeast corner of the plaintiff's tract easterly, would escape our land entirely. *Knight* v. *Wilder*, 2 Cush., 209; *Hopkins Academy* v. *Dickinson*, 9 id., 544, 548,

550; *N. Haven Steamboat Co.* v. *Sargent,* 50 Conn., 199, 208; *Armstrong* v. *Wheeler,* 52 id., 428. The only safe rule is that the accretions to the south of the dividing line belong to the adjoining proprietor. In *Mulry* v. *Norton, supra,* RUGER, C. J., says (p. 436):—" It would seem to follow from the principles referred to, that the owner of Long Beach could not, even if the process of its enlargement and extension was effected by accretion, claim beyond the point where such accessions began to be made upon the property of adjoining owners, and as the line of each successive owner of uplands was reached in the process of extension, a new obstacle to the appellant's claim would seem to arise." In *Saulet* v. *Shepherd,* 4 Wall., 508, it is said:—" Before there can be a right to accession or accretion there must be an estate to which the accession can attach." In *Bates* v. *Ill. Central R. R. Co.,* 1 Black, 208, the court say:—" Before a proprietor can set up his claim to accretions and the like, he must first show that he owns the shore, and if he fail first to establish his ownership, judicial inquiry respecting his rights in or under the waters adjoining are abstractions and useless." At what point of time did the plaintiff acquire any ownership in the Benton lot? Was it before or after its emergence? South of the division line the accession attached to our estate, for the plaintiff admits he had no estate south of the line till the accession had detached and raised it. But this accession attached to our land under the water, as well as to his, and both emerged about the same time. One rule should apply to both. Where the boundary is a river, the line is not a fixed but a shifting one, and it is because the line is not stationary and established and cannot be in the very nature of the case, that the imperceptible increase by accretion is allowed to apply and to change the line, under the fiction that as you cannot see any change in the line there really is none. " That which cannot be perceived in its progress is taken to be as if it had never existed at all," is the maxim. *In re Hull & Selby Railway,* 5 Mees. & Wels., 327. But there is a qualification to the extent to which this doctrine will be carried, even in riparian grants. In *Att'y*

*Gen.* v. *Chambers*, 4 DeG. & J., 68, Lord CHELMSFORD
says:—"Although the additions may be small and insig-
nificant in their progress, yet after a lapse of time, by little
and little, a very large increasemay have taken place which
it would not be beneath the law to notice, and of which, if
the party who has the right to it can clearly show that it for-
merly belonged to him, he ought not to be deprived." It is
admitted that the *locus in quo* is a part of the Benton lot,
and formerly belonged to us. There is no question as to the
boundary. Also the increase is very large and very rapid.
If there ever can be a case for the application of this doctrine
propounded by Lord CHELMSFORD, the case at bar would
seem to be such a case, if the doctrine of accretion applies
at all. But here the dividing line is a fixed straight line es-
tablished and agreed to between adjoining proprietors on the
same side of the river in 1803, and now subject to the same
changes, mutations and freaks wrought by the west channel.
The doctrine of accretion, so far as it favors one proprietor
at the expense of another, has its proper application to ripa-
rian proprietors upon opposite sides of a river which runs
between them and forms a natural boundary between them.
But the river never ran between these proprietors. There
is no space between them. They touch each other, and the
whole philosophy of the doctrine of accretion is opposed to
the application of any such doctrine to these adjoining pro-
prietors on the same side of the river, as against and between
each other, between whom the river was never a boundary.
In our examination we have not found such an application
of the doctrine in a single case or opinion in report or text
book, and we challenge the other side to produce one. The
law favors *fixed* boundary lines; either by metes and bounds,
or by courses and distances. The lines of the Benton lot
are well established by both. The law does not favor the
establishment of fields having *shifting* lines, of no perma-
nency; yet this is the kind of lines the plaintiff seeks to have
established here. Suppose the plaintiff's land had been en-
closed by a fence, as it might have been, for he was bounded
on all sides by dry land—by what rule of law could he have

got the right to *get over that fence* and take his neighbor's
land, in case both parcels became submerged, as they did in
this case ? Is the law any different as to the title to the sub-
aqueous soil, because the supposed fence was carried away ?
And why would not that neighbor have had the same right
to climb that same fence, and take the plaintiff's land?
Where the old line is determinable, the law favors its con-
tinuance, notwithstanding a change of the river line. Gould
on Waters, § 290. When the cause of a change is a *freshet,*
the original thread of the stream continues to mark the
limits. Id., § 291. If the old bed of the river, being
gradually deserted by the current, fills up and new land is
formed, such newly formed land belongs to the opposite
riparian proprietors, respectively, to the thread of the old
river. Angell on Watercourses, 66 ; *Hopkins Academy* v.
*Dickinson,* 9 Cush., 544. This last case also decides that
land in a bend, cut off by the new channel, remains the prop-
erty of the original owner, though the opposite riparian
owner thereby lost his water-front.

4. The state never acquired any interest in our land by
its temporary submergence by the shifting of the river chan-
nel. It is claimed on the other side that the soil of a navi-
gable river belongs to the state, and that, by the submergence
of our land under the river, we lost it and the state acquired
what we lost, and the plaintiff gained it by accretion from
the state. We admit the correctness of the general propo-
sition here involved. But it is indispensable to this propo-
sition that the state should be the intermediate owner while
the land is under the water. If the state did not acquire it
from us the plaintiff did not acquire it from the state ; the
doctrine of estoppel applies to a state as well as to a private
person. *State of Vermont* v. *Society for Propagation of Gos-
pel,* 2 Paine, 545; Gould on Waters, §§ 23, 36, 37.—(*a*)
The state granted our land to us—first, by the grant to the
town by the colony, Oct. 10th, 1639 (1 Col. Rec., 36). Sec-
ond, by the patent to Wethersfield (Col. Rec., 1678–89, pp.
177–8).—(*b*) It has confirmed the grant by statute to the
" grantees, their heirs, successors, and assigns forever." Rev.

Stat., 1808, 432–4; Gen. Stat., 351, § 1.—(c) The courts of this state have formerly re-asserted and re-affirmed the title in the grantees as heretofore shown, in similar cases. —(d) Such grants have always been held by courts inviolable, and the rights of the private owner ever respected and protected, as shown. Judge KENT lays down the general rule as follows:—" If the river should then forsake its channel and make an entire new one in the lands of the owner on one side, he will become owner of the whole river, so far as it is enclosed by his land." 3 Kent's Com., 428; *Foster* v. *Wright*, 4 C. P. Div., 438. This distinction is recognized in *Mulry* v. *Norton, supra.* RUGER, C. J., says, p. 436 :—" The sovereign succeeds to the ownership of such islands and formations only as are originally created and located in tideways *outside* of the boundaries of property which has been the subject of individual ownership." The same rule is laid down in Shultes on Aquatic Rights, 117 :—" An island arising in the sea belongs to the occupant, and by consequence to the king, according to his prerogative, as being the universal occupant of the kingdom, but this is to be understood where it is *not within* the customary or assigned boundaries of neighboring estates, for *within* the prescribed limits of an estate the right of alluvion, as to islands and other increase, shall be regulated by such specific limitation.—(e) The state makes no claim to resume this land. It could not in equity; and if it could claim our land, it could for the same reason claim the land of the plaintiff. The plaintiff, then, cannot claim that the state gained our land from us, and that he gained it from the state. We conclude this division of the subject by another citation from the highest authority upon this branch of the law. Lord HALE, after stating the general proposition that the king hath the title to " increase *per alluvionem*" and *"per relictionem"* on page 14, says on page 15 :—" But this hath some exceptions . . . . . If a subject hath had by prescription the property of a certain tract, or creek, or navigable river, or arm of the sea, even while it is covered with water, by certain known metes or extents; this, though it should be relicted, the subject will

have the propriety of the soil relicted.  For he had it before, though covered with water; and although the sea is a fluid thing, yet the *terra* or *solum subjectum* is fixed; and by force of a clear and evident usage a subject may have the propriety of a private river." As prescription is founded upon a supposed grant, this exception applies with equal, and perhaps greater, force to an express grant, such as exists in our case.  The general doctrine of accretion in favor of the sovereign has this exception, therefore, that the state, by accretion, cannot invade the domains of the subject. And it harmonizes with the corresponding principle enunciated by Lord HALE, as already cited, that one subject cannot invade, by accretion, the domains of another subject.

*C. E. Perkins* and *W. S. Goslee*, for the appellee.

LOOMIS, J.  This case involves the application, in circumstances somewhat peculiar, of the principle of accretion and reliction, growing out of changes in the bed of the Connecticut River.

About the year 1700 the Connecticut River, between the towns of Wethersfield and Glastonbury, flowed at a certain point in two channels, with an island known as Wright's Island between them.  By the year 1770 the east channel had been left by the river, which now ran wholly in the west channel.  The land left by this reliction in the east channel passed into private ownership (the history of the matter being unimportant) and in the year 1802 Samuel Welles, the ancestor of the plaintiff, acquired by purchase a strip in the old channel containing about four acres, bounded west upon its center line, east upon sundry former riparian proprietors, and south on a part of a lot known as the Benton lot, and which is now owned by the defendants. There was no northern limit of this lot given by the deed, but it was described as bounded " north by bounds unknown." It in fact extended on the north to the line of the river, which by a gradual change of its bed was working to the

southward and eastward and beginning to encroach upon the lot at that end.

By a gradual change of its bed the river has made a sweeping curve, until in 1885, when the present suit was brought, it had worked its way through the entire Welles lot and a large part of the Benton lot south of it, replacing on its other side by alluvial deposit the Welles lot, and a large part of what was the Benton lot, leaving between the Welles lot and the present channel a quantity of land within the original limits of the Benton lot. The question that arises in the case is, as to the right to that part of the original Benton lot which now lies between the Welles lot and the river, but entirely on the other side of the river from that on which it originally lay.

As the river changed its bed to the eastward and southward it encroached, as has been stated, upon the Welles lot, which had originally reached it at its north end, until its whole width was within that lot ; and before the south end of it had disappeared the north end had begun to emerge on the west side of the river, which by its bend was now running at this place in a southwesterly direction ; and when the southern end of the lot was washed away and the Benton lot began to be encroached upon, a considerable part of the Welles lot, so far as original boundaries are concerned, had been restored on the west side of the river. Precisely what would be the right of the original owner to this restored land as between himself and other proprietors who might claim it by accretion, it is not necessary for us to consider, for it is conceded that the plaintiff and those under whom he claims have been for a long time in possession of this restored land and hold an undisputed title to it.

It is not necessary for us, in our enquiry into the rights of the parties, to consider whether the Connecticut River is at this point in law a navigable or non-navigable river. It is in constant use for purposes of navigation and the tide slightly ebbs and flows there, which would seem to make it at common law a navigable river, and especially would it be so under the rule generally adopted in the states of the

Union, though never formally adopted in this state, that rivers that are navigable in fact are so in law. The only difference between the rights of riparian owners in the one case and the other is, that in a non-navigable river the title of the riparian proprietors extends to the middle of the stream, while in navigable rivers it extends only to the line of high water, with certain rights extending to low-water mark. The law of accretion and reliction, which is the only law we are called upon to consider, is precisely the same in both cases. Gould on Waters, § 162.

It is claimed on the part of the plaintiff that as the Welles lot, now on the west side of the river, was increased by constant accession at its southern extremity, all this accretion belonged to this lot, not merely until its original limit was reached, but, regardless of all ancient boundaries and of all original rights, that it continued to follow the receding river, taking, as a riparian lot, whatever the river deposited in its front; it being found by the court below that the change in the river bed was entirely by gradual accretion and reliction.

The defendants admit the general principle by which a riparian owner takes all accretions from the gradual change of a river bed, but contend that that principle is not applicable to the peculiar circumstances of the present case. We will notice in their order the claims which they make with regard to the matter.

They say, in the first place, that the law of accretion applies only to the case of riparian land, and that as the plaintiff's lot did not originally bound upon the river, but was conveyed to him by distinct lines and boundaries, at least upon the sides affected by the present question, it cannot become by any changes of the river riparian land.

We cannot accede to this claim. If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be gradually washed away until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. This follows necessarily from the ordinary application of the

principle. All original lines submerged by the river have ceased to exist; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation and is not affected in any manner by the relations of the river and the land at any former period. If after washing away the intervening lot it should encroach upon the remoter lot, and should then begin to change its movement in the other direction, gradually restoring what it had taken from the remoter lot, and finally all that it had taken from the intervening lot, the whole by the law of accretion would belong to the remoter but now proximate lot. Having become riparian it has all riparian rights. This general principle is recognized by all the text writers and by numerous decisions of the English and American courts. The river boundary is treated in all cases as a natural boundary and the rights of the parties as changing with the change of its bed.

The defendants claim, in the next place, that though a riparian owner may take by accretion to the middle of a stream, or in the case of a navigable river to high-water mark, yet that that being the limit of his original title, and in the case of a non-navigable river the line of the adjoining owner, he cannot take such accretions beyond that line. This claim is utterly without support. The dividing line between the owners of the opposite sides of a non-navigable river is the middle of the river, but that middle line is merely an imaginary one and changes with every change in the bed of the stream. Thus in Gould on Waters, § 159, it is said that "if an unnavigable stream, in which the title of the riparian owner extends *ad filum aquæ*, slowly and imperceptibly changes its course, the boundary line is the center of the new channel." And numerous cases are cited in support of the position.

The final claim of the defendants, which is substantially involved in the claim last considered, is that as the part of the plaintiff's land which was last left by the receding stream was an upland corner made by two converging lines, the plaintiff was entitled to no more than the restoration of this

corner after it had been washed away, leaving all beyond it to accrue to the Benton lot from which it was originally taken.

So far as this claim is founded upon the fact that this corner was originally upland and not riparian we have already considered and disposed of it. It is only as the corner has become submerged and afterwards restored on the other side of the river that the claim presents any matter for further consideration. The defendants' idea, as we understand it, seems to be that the right of a riparian owner is like the right of an owner of land upon a highway. The latter owns to the middle of the highway upon the theory that the highway was originally taken out of the adjoining land, and on this ground it reverts to the original owners if the highway is discontinued. The claim of the defendants seems to be that the right of a riparian owner extends under the water on his upland lines in the same manner and that those lines are decisive of his rights in case of a recession of the river. But the two cases have nothing in common. They rest upon entirely different theories. The riparian owner takes the land under the stream because the stream is a natural boundary and not because the land was once his. Whenever a portion of a riparian lot is washed away by the river, the riparian owner becomes entitled to the land under the water as far as the center of the stream, without any reference to the original limit of his land or to his upland lines. He takes whatever front upon the river its change of bed gives him and by lines that run from the termini of his upland lines at right angles to the center line of the stream. We are speaking now of non-navigable rivers, but the same rule applies in the case of navigable waters, the lines to low-water mark being extended on the same principle. All the authorities agree in this. Thus in Gould on Waters, § 162, it is said that "every proprietor is entitled to frontage of the same width on the new shore as on the old shore, and at low-water mark as at high-water mark, without regard to the side lines of the upland. * * * * * In general the lines of division are to be made to

the channel in the most direct course from the lateral boundaries of the several tracts of upland to which the flats are appended. * * * * * So also in the case of unnavigable streams, which are the property of the riparian proprietors *usque ad filum aquœ*, the side lines are extended to the center of the stream from the termini on the bank at right angles with the general course of the river." Numerous authorities are cited in support of these positions.

It necessarily follows from this reasoning that the land of the plaintiff took by accretion all that lay between its river front on the west side of the river and the receding bed of the river, and within lines drawn from the termini of its side lines at right angles to the channel of the river. And within these lines falls the land in dispute.

As the view we have taken disposes of the case, it is not necessary that we should consider the question, presented by the record, with regard to the rights acquired by the plaintiff by adverse possession.

There is no error in the judgment of the Superior Court.

In this opinion the other judges concurred.