## MAW, Appellant, v. BRUNEAU, Respondent.

### (156 N. W. 792)

(File No. 3788.   Opinion filed March 4, 1916.)

**Waters—Shiftings of Missouri River—Accretions—Erosions as Affecting Lands on North Bank, Subsequently Becoming Lands on South Bank, then Again on North Bank—Change of State Line—Permanency of Island, as Nucleus of Accretions—Sufficiency of Evidence.**

Defendant, who in a suit to determine adverse right and possession of, and to quiet title to certain lands, of which plaintiff claimed ownership derived through patent from the United States, defendant claiming title by and as accretions to riparian lands owned by him and then located in Nebraska, recovered judgment establishing title in him. The lands in dispute were originally separated from lands owned by defendant and to which he claims the lands in dispute became accretions, by the channel of the Missouri River; which stream afterwards, and between 1869 and 1900, veered northward until it flowed around north of the land in dispute and to which plaintiff held title, so that the situs of plaintiff's land, included the land in dispute was, for a time, located in Nebraska, while the old channel gradually became partly filled with sand and soil and formed a bayou, which bayou then lay between defendant's riparian land and that claimed by both parties. About 1900 the channel of the river again changed, at a point

substantially where it had previously changed and turned northward, and again ran eastward and south of the original channél which had become a bayou, so that defendant's riparian land was thrown into the state of South Dakota. The evidence was conflicting as to whether an alleged island, situated close to and north .of the original channel thus partially filled, was completely eroded away by said movement of the channel northward. **Held,** in view of evidence showing that there existed at the locus of said island a point of ground higher than that ·of the surrounding land, and that there stood upon it many clumps of ash trees 16 to 18 years old, which were sprouts from roots of stumps, some of which trees were 16 to 18 inches in diameter, the trees that grew upon these stumps being from 40 to 50 years old when cut down, that the facts preponderate in favor of the theory that said island did exist, and that a portion of other land belonging to plaintiff was never at any time between 1869 and 1900 eroded, washed away and destroyed by the change of the bed and channel of the river, and therefore never became a portion of defendant's riparian land as an accretion thereto, but that the portions of said accretions lawfully attached to said island area became vested in plaintiff or her predecessor in interest as accretions to her land; and this notwithstanding the locus of the lands in controversy was for a time in Nebraska.

Appeal from Circuit Court, Union County. Hon. Joseph W. Jones, Judge.

Action by Emily S. Maw, against Henry Bruneau, to determine adverse right and possession, and to quiet title to realty From a judgment for defendant, and from an order denying new trial, plaintiff appeals. Reversed and remanded.

*Chas. Stickney, C. N. Jepson,* and *C. M. Stilwill,* for Appellant.

*Thomas McInerny,* and *Edwin J. Stason,* for Respondent.

Appellant cited: Ocean City Ass'n vs. Shriver, 51 L. R. A. 425; St. Louis vs. Rutz, 138 U. S. 226; C. J. Holman vs. Jas. M. Hodges, 58 L. R. A. (Ia.) 673; Stockley v. Cissna, (Tenn.) 104 S. W. 802; Widdecombe vs. Rosemiller, 118 Fed. 295.

Respondent cited: Nebraska v. Iowa, 143 U. S. 358, 36 L. Ed. 186; Civ. Code, Sec. 900; Crandall v. Allen, (Mo.) 22 L. R. A. 591; Cox v. Arnold, (Mo.) 50 Am. St. Rep. 450, 452; Holman v. Hodges, 112 Iowa, 714, 718; III. Farnham on Waters, p. 2494; St. Louis v. Rutz, 138 U. S. 226, 11 Sup. Ct. 337; Bouvier v. Stricklett, (Neb.) 59 N. W. 550; Quinlan v. Bartley, (Ia.) 80

N. W. 405; Rober v. Mickelsen, (Neb.) 116 N. W. 949; Coulthard v. McIntosh, 122 N. W. 233, 143 Iowa, 389; O'Connor v. Petty, (Neb.) 146 N. W. 947; Kitteridge v. Ritter (Ia.), 151 N. W. 1097; State of Nebraska v. State of Iowa, 143 U. S. 358, 36 L. Ed. 186; State of Iowa v. Carr, 112 C. C. A. 477, 481, citing; New Orleans v. United States, 10 Pet. 662, 9 L. Ed. 573; Kinkead v. Turgeon (Neb.), 109 N. W. 744; Topping v. Cohn (Neb.) 99 N. W. 372; Babson v. Tainter, 79 Me. 368, 375, 10 Atl. 63.

McCOY, J.   This suit was instituted to determine adverse right and possession and to quiet title to certain lands claimed to be owned by both plaintiff and defendant, now situated in Union county, S. D.   The plaintiff is in possession and claims title by and through patents from the United States and other mesne conveyances.   The defendant claims title by and as accretion to riparian lands owned by him in the state of Nebraska.   These lands in dispute are what are sometimes termed "bottom lands," and at different times within the last 60 years have been on both sides of the main channel of the Missouri river, a part of the time being in the territory and state of South Dakota, and a part of the time in the state of Nebraska, due to the shifting and changing of the bed and main channel of the river.   A noted humorous author, in relation to the habits and eccentricities of the Missouri river, among other things, has most aptly written:

"It is a perpetual dissatisfaction with its bed that is the greatest peculiarity of the Missouri.   It is harder to suit in the matter of beds than a traveling man.   Time after time it has gotten out of its bed in the middle of the night, with no apparent provocation, and has hunted up a new bed, all litered with forests, cornfields, brick houses, railroad ties, and telegraph poles. * * * Then it has suddenly taken a fancy to its old bed, which by this time has been filled with suburban architecture, and back it has gone with a whoop and a rush, as happy as if it had really found something worth while.

"Quite naturally this makes life along the Missouri a little bit uncertain.   Ask the citizen of a Missouri river town on which side of the river he lives, and he will look worried, and will say: 'On the east side when I came away.'   Then he will go home to look the matter up, and, like as not, will find the river on the

other side of his humble home, and a government steamboat pulling snags out of his erstwhile cabbage patch.

"It makes farming as fascinating as gambling, too. You never know whether you are going to harvest corn or catfish. The farmer may go blithely forth of a morning with a twine binder to cut his wheat only to come back at noon for a trout-line; his wheat having gone down the river the night before.

"These facts lead us naturally to the subject of the Missouri's appetite. It is the hungriest river ever created. It is eating all the time, eating yellow clay banks and cornfields, 80 acres at a mouthful, winding up its banquet with a truck garden, and picking its teeth with the timbers of a big red barn. Its yearly menu is 10,000 acres of good, rich, farming land, several miles of railroad, a few hundred houses, a forest or two, and uncounted miles of sand bars.

"This sort of thing makes the Missouri valley farmer philosophical in the extreme. The river may take away half his farm this year, but he feels sure that next year it will give him the whole farm of the fellow above him. But he must not be too certain. At this point the law steps in and does a more remarkable thing than the river itself may hope to accomplish. It decrees that so long as there is a single yard of an owner's land left —nay, even so long as there is a strip wide enough to balance a calf upon—he is entitled to all the land that the river may deposit in front of it. But, when that last yard is eaten up, even though the river may repent and replace the farm in as good order as when it took it, the land belongs to the owner of the land behind it."

We have quoted the foregoing for the sole purpose of illustrating the natural and well-known changing and varying conditions of the Missouri, and not for the purpose of approving the legal proposition therein referred to, as we find some considerable diversity of judicial opinion to exist regarding the legal status where one's surface soil has been completely eroded and washed away, and then, by accretions, having been replaced with other surface soil so as to restore such land to substantially its former condition. Wells v. Bailey, 55 Conn. 292, 10 Atl. 565, 3 Am. St. Rep. 48; Peuker v. Canter, 62 Kan. 363, 63 Pac. 617; Association v. Shriver, 64 N. J. Law, 550, 46 Atl. 690, 51 L. R. A.

425, and note; Gilbert v. Eldridge, 47 Minn. 210, 49 N. W. 679,
13 L. R. A. 411. However, as we view the evidence, this particu-
lar question is not a controlling or vital proposition as applied to
the facts of this case.

The foregoing plat will be referred to for convenience in
showing the approximate locations of lands and river. The par-
cels of land in dispute are marked with "X," and are all situated
in section 1, *now* situated in the state of South Dakota. The de-
fendant owns riparian lands formerly in the state of Nebraska
on the opposite side of the original main channel of the Missouri
as located prior to 1869, but which lands since the year 1900 have

been on the north side of the main channel, and now are in the state of South Dakota. Prior to 1869, and again from the spring of 1900 to the present time, the main channel was to the south and east of the lands in dispute. For some 20 or more years next previous to the year 1900 the main channel had been west and north of these lands. In the spring of 1900 the river suddenly left its channel west and north of the lands in dispute and went to the south of its original bed and channel, occupied by it prior to 1869, and there cut out a new channel to the south of the riparian lands owned by defendant, where it ever since has remained. The defendant, who is respondent in this court, contends that, beginning about the year 1869, the north shore line of the river, as then located, and being between points A and E, as indicated on the plat, began to gradually and slowly move northwestward, that the action of the waters pressing against this entire north shore line gradually and slowly ate into, eroded, and washed away the adjoining soil, and at the same time the opposite south shore, bounding the north line of defendant's land then in Nebraska, also began to move northwestward, by a filling in and adding to of alluvial soil, sand, and drift sediment, and by natural accretions defendant's lands followed the south shore line in its northward course over and across the said lands in dispute in said section 1, and that this washing and eroding away on the north shore line, and the alluvial deposits adding to on the south shore line by said accretions, continued for something like 20 years or more, and until by such processes the entire portion of said section 1 on the Dakota side was completely and wholly washed and eroded away; in other words, that the main channel of the river, by cutting out and completely destroying and washing away all surface soil on the north side, and by depositing and filling in on the south side, moved the entire river channel north to the position it occupied in the spring of 1900, and that the entire surface soil that prior to 1869 occupied the same position as occupied now by the surface soil of the said parcels of land in dispute was wholly and completely destroyed and eroded away, and that the surface soil now on said land was added thereto by deposits and accretions to the riparian lands of defendant, formerly situated in the state of Nebraska.

The learned trial court found in favor of defendant on this

contention, and the plaintiff, who is appellant in this court, now urges as error that such finding is not supported by the preponderance of the evidence; that the clear preponderance of the evidence is against said finding. It is the contention of appellant that, when in 1869 the waters commenced cutting into the north and west shore bank, upon portions of lots 1, 2, and 3, indicated on the plat, there was then a growth of trees, cottonwood and ash; that the land on which these trees grew, a narrow crescent shaped strip of some 25 acres, was several feet higher in altitude than the surrounding surface of the soil to the north and west, and that soon after the beginning of such cutting in and washing away process a small channel broke through somewhere between points B and C, shown on the plat, into the lower ground, and ran around west and north of the narrow strip, on lots 1, 2, and 3, on which the trees grew, leaving this narrow strip for some years as an island, but that the channel, small at first, which ran around to the west and north of the strip on which the trees grew, continuing to cut out and wash away to the west and north, soon became the main channel, and the opening into the old channel between points B and F soon thereafter became closed with deposits of sand and upon which willows and small trees and shrubs thereafter grew; that this old channel was thereafter for many years known as a bayou, and contained dead and sluggish waters, but finally became practically filled up with sand, soil, and sediment, so that at most times of the year persons might travel across the place of the old channel with teams and vehicles, the main channel, in the meantime, having gone nearly a mile further to the northwestward; that this strip of land designated as an island at times when there was still a current in the old channel was often submerged, and was at times referred to as the "towhead" in the river; and that by reason of said portions of said lots 1, 2, and 3, never having been eroded and washed away the same never became a portion of defendant's riparian lands as an accretion thereto.

The oral testimony, in relation to whether or not there ever was an island or towhead in the river occupying a portion of said lots 1, 2, and 3 in section 1 was conflicting and attended with much uncertainty. This conflict and uncertainty in the oral testimony was naturally and necessarily due to the length of time that

has elapsed since this particular lateral location was within the
shore lines of the main channel. The witnesses who testified and
who are now under 60 years of age were then boys in their
"teens." After the current ceased to run in the old channel,
which then filled with sand and debris between points B and F,
and which occurred in the early 70's, this particular location pass-
ed to the south bank of the main channel, with the bayou between
it and defendant's riparian lands. After such lapse of time it is
a very easy matter to see how different witnesses might honestly,
but mistakenly, say there was or was not an island at said loca-
tion. If there was no other testimony in this case as to the exist-
ence of the island or towhead than that contained in the oral testi-
mony, the conflict therein is such that we would be inclined to not
disturb the findings of fact; but there has been shown to exist
some natural physical facts which have a more conclusive and sub-
stantial effect than any of the oral testimony, and which physical
facts, as we view them, clearly preponderate in favor of the prop-
osition that there was a narrow slightly crescent-shaped strip of
land of some 25 acres, more or less, located on lots 1, 2, and 3,
that was never eroded, washed away, and destroyed by the cur-
rents of the river in its said gradual northwestward change of
bed and channel between 1869 and 1900. The contour and outline
of the body of this crescent-shaped strip of land, called the island,
still exists, and is bounded and marked at the present time by the
surrounding raised banks from 2 to 6 or more feet in attitude;
the whole of the island area being higher than the immediately
surrounding lands as at present existing. This raised island area
has growing upon it many clumps of ash trees 16 to 18 years of
age, which clumps of trees are sprouts from the roots of stumps
some of which stumps are from 16 to 18 inches in diameter. The
trees that grew upon these stumps were from 40 to 50 years old
at the time they were cut down. It is contended by respondent
that these stumps from which the present growing sprouts origi-
nated were washed out and carried down from some other place
upstream, and were lodged and deposited at the place where now
found by the action and currents of the waters of the stream.
While such a thing might occasionally happen, still it is hardly
within the range of reasonable possibility that some 50 or more
instances of such transplanting of stumps in vertical, upright, na-

tural positions would occur on so small an area of land. We are of the view that these physical facts clearly preponderate in favor of the theory that a portion of the surface soil of said lots 1, 2, and 3 was never at any time between 1869 and 1900 eroded, washed away, and destroyed by the changing of the bed and channel of the Missouri, and therefore never became a portion of defendant's riparian lands as an accretion thereto, but that whatever portions of such accretions lawfully attached to said island or towhead area became vested in and inured to the benefit of plaintiff or her predecessors in interest as accretion to said lots 1, 2, and 3.

If said portion of said lots 1, 2, and 3 always remained intact, and it never became an accretion to defendant's riparian lands, then plaintiff's predecessors in interest never lost title thereto, and this would be true no matter if, for a time, the situs of said lots was located in the state of Nebraska. If all portions of section 1 had been entirely and completely eroded and washed away, and the situs thereof had thereafter been rebuilded with a new surface soil by means of deposits of sand and soil, then we would have before us for consideration the proposition about which there seems to be much diversity of judicial opinion hereinbefore referred to, but which proposition is not necessary to be decided in this cause when we conclude that a portion of said lots 1, 2, and 3 was never eroded or washed away, but remained intact. Farnham on Waters, vol. 1, pp. 331, 332, and vol. 3, pp. 2484 to 2490.

The judgment and order appealed from are reversed, and the cause remanded for further procedure consistent with this decision.