0223

HORRY COUNTY, A Body Politic, Petitioner, v. Edgar A. WOODWARD, Hazel W. Butler, Ralph C. Price, Joseph N. Morse, and also all other persons unknown, claiming any right, title, estate, interest in or lien upon the real estate described in the notice of Lis Pedens herein, Respondents, of whom Ralph C. Price is Appellant, and Edgar A. Woodward and Hazel W. Butler are Respondents.

(318 S. E. (2d) 584)

Court of Appeals

*Howell V. Bellamy, Jr.,* and *Bradley D. King,* of *Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers,* Myrtle Beach, *for appellant.*

*D. W. Green, Jr.,* of *Green, Sasser & Beverly,* Conway, *for respondents.*

Heard Jan. 24, 1984.

Decided Aug. 3, 1984.

. BELL, Judge:

This is a title dispute over that portion of Bird Island situated in Horry County, South Carolina. The County of Horry, in the exercise of its power of eminent domain, has taken the disputed land for a public use. The issue between the parties to this appeal is who is to receive compensation from the County for the taking. The circuit court held that the respondents Woodward and Butler were the owners of the land and that the appellant Price had no claim to it. The court ordered the County to pay Woodward and Butler just compensation of $172,687.60. Price appeals. We affirm.

Bird Island lies on the North Carolina-South Carolina border at the mouth of the Little River. This portion of the boundary line between the two states was fixed by statute in 1815.[1] At the present time, the island is located principally in North Carolina.

At its mouth, the Little River forms Little River Inlet, the northernmost inlet on the South Carolina coast. During the past eighty years, the Inlet has moved north and south of the state line as a result of natural changes. At times it has straddled or been directly on the boundary between the two states.

Woodward and Butler claim the disputed land on the strength of a record chain of title in South Carolina dating back to 1903. In that year the State of South Carolina granted

---

[1] *See* Act No. 2089, 1 Stat. at Large of South Carolina 419 (1815); Act No. 2005, 5 Stat. at Large of South Carolina 667 (1812); Laws of North Carolina, 1815, c. 2 (1816); Laws of North Carolina, 1808, c. 2, art. 2, n.d.; art. i, sec. 25, Constitution of North Carolina, 1776, reprinted in 5 F. Thorpe, *The Federal and State Constitutions* (1909); A. Salley, *The Boundary Line between North Carolina and South Carolina,* 10 Bull. Hist. Comm. of South Carolina, at 31-38 (1929).

twenty acres of sand beach (identified on later maps as Bird Shoal Beach or Bird Island) to one N. B. Morse. The map attached to Morse's deed showed the land granted to him was bounded by the North Carolina-South Carolina state line on the east, the Atlantic Ocean on the south, Little River on the west, and Mad Inlet Creek (also called Bonaparte Creek) on the north. Woodward and Butler now hold record title to Morse's land by mesne conveyances. They have paid taxes on the property to Horry County, South Carolina, since acquiring title in 1958.

In 1953, one Donald V. Richardson, Jr., the holder of title in North Carolina, deeded Bird Island to Price. At that time, Little River Inlet straddled the state line so that no part of Bird Island was in South Carolina. The Little River thus formed the southwestern boundary of Bird Island in North Carolina. Price has no record chain of title in South Carolina and has never paid taxes on the South Carolina portion of the island. He claims title to the disputed land by accretion.

The parties have stipulated that from 1903 until some time after 1929, the disputed property, or some portion of it, extended across the state line into South Carolina. However, from some time in the 1930's until approximately 1960, the portion of Bird Island which had been in South Carolina eroded away. Since 1960, accretion has occurred gradually and imperceptibly as a natural result of the ebb and flow of the adjoining tidal waters. In consequence, the southwestern end of the island now once again extends into South Carolina. At the commencement of this suit, the South Carolina portion of the island comprised approximately 43.07 acres.

The question presented for our decision is whether Price may follow accretions to his deeded land across a fixed boundary line previously submerged by a gradual process of erosion, even though the accreted land extends over the same place where riparian land in the chain of title of Woodward and Butler was located before the erosion took place. This is a question of first impression in South Carolina.

South Carolina recognizes the general common law rule that accretions by natural alluvial action to riparian or littoral lands become the property of the riparian or littoral owner whose lands are added to. *See Spigener v. Cooner*, 42 S. C. L. (8 Rich.) 301, 64 Am. Dec. 755

(1855) (dictum); *State of South Carolina v. Beach Co.*, 271 S. C.
425, 248 S. E. (2d) 115 (1978) (dictum). Conversely, lands grad-
ually encroached upon by water cease to belong to the former
riparian or littoral owner. *See Spigener v. Cooner, supra*
(dictum). The rule rests on the impossibility of identifying at
any given moment the imperceptible additions to or subtrac-
tions from riparian land caused by the constant natural ac-
tion of water. It ensures that riparian land will remain
riparian, whatever changes may take place in the adjacent
watercourse or shoreline by accretion or reliction. The law
gives the riparian proprietor the benefit of additions to his
land caused by accretion or reliction. However, it also requires
him to bear the corresponding risk that land will be lost by
gradual erosion or submergence. The rule is said to rest on the
principle of natural justice that one who sustains the burden
of losses imposed by the contiguity of waters shall be entitled
also to whatever benefits they bring. *Ocean City Association
v. Shriver*, 64 N. J. L. 550, 46 A. 690, 51 L. R. A. 425 (1900); J.
Angell, *A Treatise On The Right Of Property In Tide Waters*,
69 (1826).

Price invokes this common law rule in support of his
claim to Bird Island. Since a riparian owner is normally
entitled to all accretions to his land, Price argues he is
entitled to the portion of Bird Island now lying in South
Carolina, which accreted to his deeded land in North Carolina.
The application of the rule to the facts of this case is not so
simple, however. If a body of water is not the boundary along
which the landowner claims the right of accretion, the rule
may not apply. *See Mulry v. Norton*, 100 N.Y. 424, 3 N.E. 581
(1885) (claim across lateral boundary rejected).

In this case, the lands deeded to Price were not originally
bounded by water on the southwest. In 1903, Price's predeces-
sor in title held Bird Island to the South Carolina state line, a
fixed boundary. Morse, the predecessor in title of Woodward
and Butler, owned the island from the state line to Little
River. Thus, Morse, not Price's predecessor, was the original
riparian owner along Little River Inlet. For this reason, Price
cannot claim the same rights an original riparian owner
would have under the rule of accretion.

When nonriparian land becomes riparian by gradual ero-
sion, the American authorities disagree on whether the new

riparian owner can follow subsequent accretions across his old boundary with the original riparian owner. *See*, Annot, 8 A. L. R. 640 (1920); Annot, 41 A. L. R. 395 (1926).

Some authorities adhere to the rule first announced in *Welles v. Bailey*, 55 Conn. 292, 10 A. 565, 566-567 (1887):

> If a particular tract was entirely cut off from a river by an intervening tract, and that intervening tract should be gradually washed away, until the remoter tract was reached by the river, the latter tract would become riparian as much as if it had been originally such. This follows necessarily from the ordinary application of the principle [of riparian ownership]. All original lines submerged by the river have ceased to exist; the river is itself a natural boundary, and every changing condition of the river in relation to adjoining lands is treated as a natural relation, and is not affected in any manner by the relations of the river and the land at any former period. If, after washing away the intervening lot, it should encroach upon the remoter lot, and should then begin to change its movement in the other direction, gradually restoring what it had taken from the intervening lot, the whole, by the law of accretion, would belong to the remoter but now approximate lot. Having become riparian, it has all riparian rights.

Other jurisdictions reject the *Welles* rule in favor of the so-called "reemergence doctrine" announced in *Ocean City Association v. Shriver, supra.* A concise statement of this latter doctrine is found in *Greeman v. Smith*, 138 N.W. (2d) 433, 436 (N.D. 1965):

> Where land which was riparian at the time of the original survey is lost by erosion, so that nonriparian land becomes riparian, and land is thereafter built by accretion to the land which was originally nonriparian, extending over the location formerly occupied by the original riparian land, the owner of the land which was originally nonriparian has title only to the accreted land within the boundaries of the formerly nonriparian tract; and all other land so accreted, extending over the area formerly occupied by the land of the original riparian owner, becomes the property of the owner of the original riparian land.

Quoting *Perry v. Erling*, 132 N.W. (2d) 889 (N.D. 1965).

In our opinion, the doctrine of reemergence is the preferable rule. It better comports with the historical understanding of the rules governing accretion, it is more consistent with the underlying reasons for those rules, and it corresponds more closely to the dictates of fairness between the parties on the facts of this case.

The rules of accretion enjoy an ancient lineage. They have descended from the classical Roman law to the modern common law through the mediation of Justinian, Bracton, Fleta, Hale, and Blackstone.[2] From the earliest times the authorities agree that a riparian owner ordinarily takes title to gradual accretions to his land. Conversely, he suffers the loss of land gradually encroached upon by the natural action of water.[3] But they also agree that the rule does not apply where accretions occur across a fixed boundary.[4] Moreover, the authorities have generally regarded the gradual and total washing away of riparian land which is later restored by accretion to its former location as a special case.

A text taken from the republican jurist, Alfenus Varus (consul, 39 B.C.), sets forth the prevailing view of the classical Roman lawyers:

> Attius had a tract of land along a public road. Beyond the road was a river and the field of Lucius Titius. First the river gradually eroded away (*ambedit*) the whole field, which was between the road and the river, and washed away (*sustulit*) the road. Thereafter, the river gradually receded and by alluvial action returned to its former location. The opinion was given that since the river had taken away both the field and the road, the field became his who owned the tract of land on the other side of the river. Thereafter, since the river gradually receded, the field was taken away from him whose it had become and

---

[2] Inst. Just. 2.1.20 *et seq.*, Dig. 41.1.7 (T. Mommsen and P. Krueger ed. 1970); Bracton, *On the Laws and Customs of England*, bk. ii, c. 2 (S. Thorne ed. 1968); Fleta, bk. iii, c. 2 (H. Richardson and G. Sayles ed. 1972); Hale, *De Jure Maris*, part i, cc. iv, vi, reprinted in 1 Hargrave's Law Tracts (1787); 2 Bl. Comm. c. 16 (W. Lewis ed. 1902).

[3] Inst. Just. 2.1.20 *et seq.;* Bracton, f. 9, at 44; Fleta, bk. iii, c. 2, at 3; 2 Bl. Comm. c. 16, at 262.

[4] Dig. 41.1.16; Bracton, f. 9b, at 45; Fleta, bk. iii, c. 2, at 3.

was given back to him who was across the road, because his land was nearest to the river. But the road, which had been public, was added to no one by alluvion. Nevertheless, it was said the road was not an impediment, and that the field left by the deposit of alluvion across the road did not belong to Attius. \*\*\*\*

Dig. 41.1.38. *See also,* Dig. 41.1.30.3 (Pomponius) (alluvium restores a field between public road and river to former owner even though field was totally washed away and whether it was washed away gradually or not); Dig. 41.1.7.5. *ad fin.* (Gaius) (rule that former owner whose land has been entirely washed away cannot reclaim land restored by accretion, since he has nothing left to which alluvium can be added, although correct as matter of strict logic, would not be maintained in actual practice).

The great commentators on the common law accepted the same principle. Bracton, following Gaius, rejected the strict doctrine of accretion in the case of reemergent lands. According to Bracton, a rule giving such lands to the new riparian owner rather than the original riparian owner was "scarcely equitable and would not be enforced." Bracton, f. 9b, at 45. Fleta adhered to the same view. Fleta, bk. iii, c. 2, at 4. Although Blackstone did not mention the specific case of reemergence, he rested the law of accretion and reliction on the general principle that a riparian owner who suffers the loss of his land to the sea should have the benefit of any gain by alluvion or dereliction:

> For *de minimus non curat lex;* and, besides, these owners being often losers by the breaking in of the sea . . . this possible gain is therefore reciprocal consideration for such possible . . . loss.

2 Bl. Comm., c. 16, at 262.

This latter principle was also described as the common law rule in Hale's *De Jure Maris.* Discussing the Abbot of Ramsey's case, which involved title to sixty acres of marsh created by the flux and reflux of the sea, he said:

> . . . yet it is plain, that the title stood upon that which the abbot alleged by way of increment. And note . . . he relied upon the common right of his case, as that he suffered the

loss so he should enjoy the benefit, even by the bare common law in case of alluvion.

*De Jure Maris*, c. vi., sec. ii. 1, at 29.

Hale applied a similar rule to the case where littoral lands are first destroyed by the action of the sea and later restored by reliction:

> If a subject hath land adjoining the sea, and the violence of the sea swallow it up, but so that yet there be reasonable marks to continue the notice of it; or though the marks be defaced; yet if by situation and extent of quantity, and bounding upon the firm land, the same can be known, though the sea leave this land again, ... the subject doth not lose his propriety: and accordingly it was held by Cooke and Foster, M. 7. Jac. C.B. though the inundation continue forty years.
>
> If the mark remain or continue, or extent can reasonably be certain, the case is clear.—Vide Dy. 326.[5]

*De Jure Maris*, c. iv, sec. ii. 2.2, at 15. The same principle has been said to apply where a stream deprives a riparian owner of his land by making a new channel and subsequently returns to its ancient bed. H. Woolrych, *A Treatise Of The Law of Waters*, 46-47 (1853).

---

[5] Contrary to the view taken by some American courts, the quoted passage does not refer to the case of a sudden retreat by the sea. In the leading case of *Yearsley v. Gipple*, 104 Neb. 88, 175 N.W. 641 (1919), the Supreme Court of Nebraska ascribed the quoted passage to a section of chapter 6 of *De Jure Maris* which the court thought applied only to *sudden* changes. On this ground, the Nebraska court criticized the holding in *Ocean City Association v. Shriver, supra*, as resting on a misconception of the common law rule. In fact, the quoted passage is not from chapter 6, but from chapter 4. That it deals with gradual accessions seems clear from the cases Hale relies on to support the text. In particular, the Abbott of Ramsey's case (1574) 3 Dyer 326b, 73 Eng. Rep. 737, is treated by Hale as a case of alluvion, which he describes as the adding to land "by insensible degrees." *De Jure Maris*, c. vi, sec. ii. 1. The Nebraska court's attempted distinction of land restored by accretion and land left by gradual reliction also finds little support in the classic common law commentaries. Blackstone, for example, expressly treats alluvion and dereliction as governed by the same rules. *See*, 2 Bl. Comm. c. 16, at 261-262; *see also* J. Gould, *A Treatise On The Law Of Waters* § 155, at 311 (1891) (no distinction between soil gained by accretion and that uncovered by reliction). The English cases cited by the Nebraska court as supporting the rule in *Welles v. Bailey* deal not with reemergence but with the rights of a littoral owner in a case of pure accretion or submergence.

These authorities persuade us that the historical under-standing of the rules of accretion and reliction favor the original riparian owner when land reemerges across a fixed boundary. The acknowledged rationale of the common law is that he who bears the loss from erosion should receive the benefit from accretion. The doctrine of reemergence is simply more consistent with that rationale than is the rule in *Welles v. Bailey.*

In this case, Price and his predecessors in title lost no land beyond the South Carolina line by the action of contiguous waters. They have never held title of record to Bird Island in South Carolina. If Price were permitted to follow accretions across the original boundary of his property, he would receive a windfall unrelated to any risk of loss imposed on him by the law. Conversely, Morse and his successors in title, having suffered the loss of their land by erosion (a risk imposed on them by law as well as nature), would be deprived of the reciprocal benefit of accretion which the law normally grants to a riparian owner. Such a result is against reason and equity.

We, therefore, hold that when riparian land, which was separated from remoter land by a fixed boundary at the time of the original grant, is lost by erosion so that the remoter land becomes riparian, and land is thereafter added by accretion to the land which was originally remote, extend-ing over the location formerly occupied by the original riparian land, the owner of the land which was originally remote has title to the accreted land up to the fixed boundary of his formerly nonriparian tract. All other land so accreted, extending beyond the fixed boundary over the area formerly occupied by the original riparian land, becomes the property of the owner of the original riparian land. Under this rule, Price is entitled to follow accretions only to the original boundary between his land and that of Woodward and Butler. Beyond that line, title to the accreted land is in Woodward and Butler. The judgment of the circuit court is accordingly correct.

Affirmed.

SHAW and GOOLSBY, JJ., concur.