Murray S. SCUREMAN,
et al. Plaintiffs,

v.

Richard B. JUDGE and Ingabritta
Judge, Defendants/Third
Party Plaintiffs,

Russell T. Aaronson, Jr., et al.,
Third–Party Defendants,

Town of Dewey Beach, Intervenor.

C.A. No. 1486–S.

Court of Chancery of Delaware,
Sussex County.

Submitted: April 27, 1999.

Decided: Oct. 5, 1999.

William E. Manning and Richard A. Forsten, of Duane, Morris & Heckscher LLP, Wilmington, Delaware, for Plaintiffs Victor and Sue Ann Houlon, Peter and Rochelle Berman, Leslie M. Berger, Judith Mandell Elson, Richard Mandell and James L. Goodwill, III.

Robert V. Witsil, Jr., Georgetown, Delaware, for Intervenor Town of Dewey Beach.

## OPINION

JACOBS, Vice Chancellor.

Because the Court has previously granted limited relief from a final judgment under Court of Chancery Rule 60(b), the issue again presented is whether the southern portion of Lake Drive—a publicly dedicated right-of-way located in Rehoboth Beach, Sussex County, Delaware—is currently located above ground or under wa-

**1.** *Scureman v. Judge,* Del.Ch., 626 A.2d 5, 16 (1992).

**2.** Del.Supr., 628 A.2d 85 (1993).

**3.** Four of the current plaintiffs were originally respondents in this action; the remaining four are spouses or siblings of these four original respondents. For the sake of simplicity, the current plaintiffs are referred to in this Opinion as "plaintiffs."

ter. For the reasons that follow, the Court concludes, contrary to its original determination, that the disputed portion of Lake Drive is located under water.

## I. PROCEDURAL HISTORY

The issue arises in a somewhat unusual way. In its October, 1992 Opinion addressing the merits of the case and granting summary judgment to the plaintiffs ("*Scureman I*"), this Court held that Lake Drive is a publicly dedicated right-of-way created by an 1876 "New Plot of Rehoboth City" (the "1876 plot plan") that showed Lake Drive as a fifty-foot right-of-way which followed the then-contours of Silver Lake. Specifically, the Court found that the southern portion of Lake Drive was "... located alongside or nearly adjacent to Silver Lake, and would in no event be located under water."[1] That finding was later affirmed on appeal, and has been final since 1993.[2]

On August 29, 1997, the current plaintiffs, who own private homes on certain lots that now abut the southern portion of Silver Lake, moved for relief under Court of Chancery Rule 60(b). In their motion, which they filed after having exhausted other avenues of relief, the plaintiffs asked the Court to reverse its earlier ruling and determine that the southern portion of Lake Drive is located under water. Alternatively, plaintiffs asked the Court to reopen the record and consider additional evidence on that issue. The Town of Dewey Beach was allowed to intervene as a party defendant to oppose the motion.[3]

In an Opinion handed down on June 26, 1998, this Court concluded that a limited

The original defendants no longer have an interest in this proceeding, and have not participated in this phase of the litigation. At this stage, the only adverse party of record is the Town of Dewey Beach ("Dewey Beach" or "intervenor"), which was allowed to intervene as a defendant to assert the interest of the public in having continued use of the right-of-way, as currently located, as an access road from Rehoboth Beach to Dewey Beach.

rehearing should be granted under Rule 60(b)(6), because the circumstances driving the motion were "extraordinary" and involved "extreme hardship." *Scureman v. Judge*, Del.Ch., C.A. No. 1486–S, Jacobs, V.C., 1998 WL 409153 (June 26, 1998) (*"Scureman II"*). As a result of this Court's determination of the location of Lake Drive in *Scureman I*, the public right-of-way literally cut through the plaintiffs' backyards—in some cases almost up to their back porches—and as a consequence, the plaintiffs continued to experience significant privacy invasions, property damage, and other intrusions occasioned by the public's use of the right-of-way. The Court concluded that the possibility that its original "location" decision had been erroneous,[4] coupled with intense local public interest in that question, justified reconsideration of the location issue.

On January 11 and January 12, 1999, an evidentiary hearing was held, limited to the question of where the southern portion of Lake Drive is presently located. This Opinion, issued after post-trial briefing and argument, addresses the merits of that question.

## II. THE PARTIES' CONTENTIONS

The plaintiffs argue that once Lake Drive was laid out on the 1876 plot plan and became dedicated, its location became and remained fixed, irrespective of the movement (the ebbs and flows) of Silver Lake during the ensuing 123 years. Therefore, plaintiffs contend, the only factual issues are where the disputed portion of Lake Drive was located in 1876 when it became a dedicated public right-of-way, and whether that location is under water. Those issues were the subject of the trial in January of this year, and involved conflicting expert surveyor testimony. The factual conclusion plaintiffs advocate is that the present location of Lake Drive can

be determined by scaling the 1876 plot plan, and then by measuring the resulting courses and distances against identifiable monuments and landmarks on the ground. Once that is done, plaintiffs argue, it becomes undisputably clear that Lake Drive is presently located under water.

Dewey Beach's contrary position is that (a) this Court's 1992 determination that the southern portion of Lake Drive is located alongside the current shore of Silver Lake was and remains correct, and (b) the trial evidence adduced by plaintiffs is insufficient to persuade, let alone compel, the Court to alter its original conclusion. Alternatively, the intervenor argues that even if the plaintiffs' evidence is sufficient to establish that the 1876 location of Lake Drive is under water, that finding is irrelevant because as a matter of law the public's right-of-way moves with the shoreline of Silver Lake, and therefore the current location of Lake Drive is—and always will be—above ground.

These contentions frame two issues, the first legal and the second factual. The legal issue—which was not specifically addressed in *Scureman I*—is whether the public's right-of-way (here, Lake Drive) moves with the shoreline, wherever that might be. If it does, then the Court's 1992 determination would be correct as a matter of law, and the question of where Lake Drive was located in 1876 would become academic. If, on the other hand, the public's easement does not move with the shoreline but once established by the 1876 plot plan becomes fixed, then the location of Lake Drive would be as platted in 1876. If that is the case, the Court must then reach the factual issue, which is where Lake Drive is located, and whether that location is under water.

The Court first addresses the legal issue in Part III A, *infra*, of this Opinion, and concludes that Lake Drive does not move

---

4. Although the "location" issue was litigated and decided in the earlier summary judgment proceeding, that issue was regarded as comparatively minor, as counsel's efforts and advocacy were focused primarily upon the question of whether Lake Drive was a public right-of-way.

with the shoreline and that the location of Lake Drive is as fixed by the 1876 plot plan. In Part III B, *infra*, the Court then considers the factual issue and its related evidentiary disputes. It concludes that Lake Drive can be located by reference to the 1876 plot plan, and that contrary to the Court's original determination, Lake Drive is currently located under water.

## III. ANALYSIS

### A. *The Legal Issue: Does The Right Of Way Move With The Shoreline?*

#### 1. The Court's 1992 Ruling

Because the Court ruled on this issue in *Scureman I*, the analysis begins with that ruling. In *Scureman I* the Court found that the original 1876 deed concerning Blocks 51 and 52 (among others) from the Rehoboth Association to Charles A. Mayer reserved land along the banks of Silver Lake for Lake Drive, and that in the chains of title to all of the relevant properties surrounding Silver Lake, the deeds contain references to Lake Drive as a property boundary. The Court specifically noted that "earlier deeds to those same properties describe the northern boundary as 'the edge of Lake Drive,' and incorporate a survey depicting Lake Drive as a fifty-foot extension from the shore of Silver Lake." [5] On that basis the Court concluded that "the current deeds to the respondents' properties (or some of them) improperly convey the land upon which Lake Drive is located," and that:

"[T]hat conclusion renders legally immaterial the Wingate surveys upon which the respondents rely. A survey may be considered as evidence of a boundary only if it is consistent with the property description in the authoritative source

deed ... [citations omitted] ... In this case the authoritative deed language legally compels the conclusion that Lake Drive is located alongside or nearly adjacent to Silver Lake and would in no event be located underwater."

That ruling was affirmed on appeal,[6] and is the ruling now being reconsidered.

Although the Court held that the authoritative deed language legally compelled the conclusion that Lake Drive is above water, regrettably its 1992 Opinion does not explain specifically what deed language legally compelled that result, or why. Nor, in all candor, is the Court able to reconstruct its thought process on that issue seven years later, except to recollect that as a practical matter, it would have made little sense for the parties to expend their (and their clients') time and resources litigating whether Lake Drive was a public roadway that provided access to Block 50½, unless that roadway were above ground. But, whatever common sense appeal may inhere in that thought, it obscured a more basic premise that lurked underneath and that the parties never explicitly raised or litigated. The unstated premise was that Lake Drive would move with the shoreline of Lake Drive, and thus would always be located on fast land. That assumption, it now appears, was legally erroneous.

#### 2. The Legal Issue Revisited

■ The question now posed is whether as a matter of law a public right of way that runs along and is riparian to a body of water moves with the shoreline. If it does, then as a legal matter Lake Drive will always be above water and the analysis ends there. That issue, which appears to be of first impression in Delaware, arises

---

**5.** *Scureman I*, 626 A.2d at 15–16. For that reason the Court concluded that later (1979 and after) deeds to the lot holders' properties in which those references had been deleted and in which the northern boundary was described as "the approximate shoreline of Silver Lake," had improperly conveyed the land

underlying Lake Drive—land that the grantors did not own and had no right to convey. *Id.* at 16.

**6.** *Aff'd. sub nom, Wilmington Trust Company, et. al. v. Judge, et. al.,* Del.Supr., 628 A.2d 85 (1993).

in these unusual circumstances—a public right of way that is adjacent to a waterway and that is laid out by a municipal plot plan, in which the "edge" of that right of way is the northern boundary of the lots created with reference to that plot plan.

It is undisputed that Lake Drive was laid out along the shore of Silver Lake as set forth in and recorded on the 1876 plot plan. As platted, that street encircled the main portion of the Lake and permitted access to property on all sides thereof. Although Lake Drive was dedicated and some portions were opened and built, its southern portion (the area in dispute) was never opened or built.[7] The lots eventually sold to the plaintiffs' predecessors in title were located to the south of the unopened portion of Lake Drive. Those lots were also laid out with reference to the 1876 plot plan, and the deeds to those lots (which incorporate that plot plan) describe the northern boundary of those properties as "the edge" or "the southern edge" of Lake Drive.

The lots transferred to the plaintiffs and their predecessors were not riparian.[8] Rather, as originally platted, Silver Lake was bordered on the south by a fifty-foot wide strip of riparian property that was dedicated as a public roadway. The lots in question ran from the edge of that fifty-foot wide public roadway (the northern boundary) southward to Chesapeake Street (the southern boundary).

Dewey Beach, as intervenor, contends that the northern boundaries of the properties now riparian to Silver Lake shift with the shoreline. It urges that the public right-of-way should also be deemed to shift with the shoreline, thereby resulting in a public road of an always-constant width without regard to any encroachments by the waters of Silver Lake. The intervenor does not suggest that this result is mandated by statute or by any provisions in the deeds or the 1876 plot plan. Therefore, if the public roadway is found to shift with the shoreline, that result can only rest upon a common law principle arising out of a legally significant attribute of the properties in question.

The rule that a land boundary may shift with the shoreline normally applies to land that is riparian to an adjoining body of water. In such cases, the doctrine of accretion will cause the boundary between the riparian upland and the body of water (*e.g.*, a lake bottom) to shift with the shoreline. As the water level drops or as soil is deposited imperceptibly against the bank, the shoreline extends and the resulting accretions belong to the riparian owner. Conversely, as the lake level rises or the bank wears away, the former upland, now flooded, is lost to the riparian owner.[9] Thus, the effect of the accretion doctrine is to keep riparian property riparian.

In short, where a riparian parcel becomes completely covered by water, title

---

**7.** The 1876 plot plan created Lake Drive as a fifty-foot wide public right-of-way following alongside the ten existing contours of Silver Lake. The plot plan also created Chesapeake Street, to the immediate south of Lake Drive. The only portions of Lake Drive that were ever improved were (i) the portion of the west side running from Dewey Beach north to a bridge over the northwest tip of the lake and then to Rehoboth (that street is known today as King Charles Avenue or 1A), and (ii) the portion running along the north shore. Lake Drive to the south of Silver Lake was never used or built. Since the 1992 decision in *Scureman I*, the portion of Lake Drive to the east of Silver Lake has provided access to Block 50½ thereby solving the access issue that generated the original lawsuit.

**8.** *See, e.g., Banks v. Ogden*, 2 Wall. 57, 69 U.S. 57, 68–69, 17 L.Ed. 818 (1864); 1 Farnham, *Law of Waters and Water Rights*, § 66(b) at 304–305; § 144 at 667–69 (1904); *see generally, State of Delaware v. Pennsylvania Railroad Co.*, Del.Supr., 228 A.2d 587, 594 (1967) (riparian owner is one whose land is in contact with water).

**9.** *See, e.g., County of St. Clair v. Lovingston*, 23 Wall. 46, 90 U.S. 46, 23 L.Ed. 59 (1874); *United States v. 1,629.6 Acres of Land*, 335 F.Supp. 255 (D.Del.1971), *rev'd in part*, 503 F.2d 764 (3rd Cir.1974); *State v. Pennsylvania Railroad Company*, Del.Supr., 267 A.2d 455, 459 (1969); *State v. Reybold*, Del.Gen.Sess., 5 Harr. 484 (1854).

to that parcel is lost, and the formerly adjacent parcel becomes riparian. If the riparian parcel consists of a fifty-foot wide strip of land adjoining a lake, and that riparian parcel later becomes covered with water, the owner loses title to that property, at least (in the view of some jurisdictions) until that property reemerges by the reverse process of accretion.[10]

 But the accretion doctrine, even if applicable,[11] would not benefit the intervenor in this particular case. Under that doctrine, the *riparian* boundary (here, the boundary separating the parcel on which Lake Drive is located from Silver Lake) would shift south with the erosion of the shore, but the *non-riparian* boundaries (the boundaries that separate that parcel from the plaintiffs' lots) would not. Instead, the non-riparian boundary would remain fixed.[12] Moreover, under common law, the right-of-way itself would not migrate with the waterway. As one eminent treatise writer states, "the right of way of the public does not vary or fluctuate with the bed of the river so as to entitle the public, when the highway is completely washed away, to substitute for it a sufficient quantity of the adjacent land of the owner of the fee without making compensation for the additional land taken."[13]

Dewey Beach argues that rule should not be followed here. It urges the Court to adopt the "rolling easement" concept endorsed by the Texas Court of Appeals in *Feinman v. State.*[14] There, a public easement to a beach ran along the Gulf of Mexico, seaward of the vegetation line—an area that by custom and state statute was open to the public. The Texas Court held that the portion of the landowner's property that was burdened with the public easement shifted with any accretion to or erosion of the beach.

 Although the concept of an easement that moves with the shoreline has been recognized elsewhere, that concept is inapplicable here. The Lake Drive right-of-way is *not* an easement to cross private lands to reach a public area (such as a beach) that itself moves with the water.[15] Nor is Lake Drive a roadway that runs to a body of navigable water and is intended to provide the public access to the water. To preserve that access, such a roadway or street would need to extend or contract as

**10.** *See Horry County v. Woodward,* App., 282 S.C. 366, 318 S.E.2d 584, 586–87 (1984); *Perry v. Erling,* N.D.Supr., 132 N.W.2d 889, 890–97 (1965); *Cunningham v. Prevow,* 28 Tenn.App. 643, 192 S.W.2d 338, 343–44 (1945); *Welles v. Bailey,* 55 Conn. 292, 10 A. 565, 565–67 (1887); *Smith v. Bruce,* 241 Ga. 133, 244 S.E.2d 559, 569 (1978); *Morris v. Brooke,* Del.Supr., 25 Alb. L.J. 90 (1815)(reprinted 1882). *See generally,* Sam Glasscock, III, *Effects of Accretion and Erosion on Coastal Property in the United States,* 8 Int'l J. of Marine & Coastal Law 135, 140–43 (1993).

**11.** *Compare Hearn v. Abbott,* Del.Super., C.A. No. 89C–11–001, Graves, J., 1992 WL 207270 *2 (Aug. 6, 1992)(Slip.Op.) at 3–4, *with* 1 Farnham, *Law of Waters and Water Rights,* § 72 at 329.

**12.** *E.g., Horry County v. Woodward,* 318 S.E.2d at 586–87; *Smith,* 244 S.E.2d at 569–70.

**13.** Farnham, *Law of Waters and Water Rights,* § 144 at 672 (1904) (citing *Commonwealth v.*

*Beeson,* Va.Supr., 30 Va. 821 (1832)); *see Deltic Farm and Timber Co. v. Board of Commissioners,* La.App., 368 So.2d 1109 (1979) (servitude running along shoreline of riparian property, where that property is lost to erosion, does not follow shoreline onto adjacent parcel); *Smith v. Bruce,* 241 Ga. 133, 244 S.E.2d 559, 569–70 (1978) (public easement subject to loss by erosion). *See generally State v. Reybold,* 5 Harr. 484 (suggesting that while streets running *to* water may move with the shore so as to preserve public access, the same is not an attribute of streets running parallel to water).

**14.** Tex.App., 717 S.W.2d 106 (1986). For a general discussion of the operation of the rolling easement concept, *See* James G. Titus, *Rising Seas, Coastal Erosion and the Takings Clause,* 57 Md. L. Rev 1279, 1313 (1993).

**15.** *See Feinman,* 717 S.W.2d 106; *Bubis v. Kassin,* App.Div., 323 N.J.Super. 601, 733 A.2d 1232 (1999) (easement across property to beach remains in force despite movement of the beach).

the shoreline shifts.[16] And, Lake Drive is *not* an easement or profit a préndre which by its nature relates to an activity associated with the water, and that therefore must shift with the shore or become useless.[17] Rather, Lake Drive is a public street, laid out as a dedicated parcel of real property, and as such was intended and designed to carry traffic around Silver Lake. Lake Drive was located adjacent to—but never upon—the private lands of the plaintiffs.

Thus, the facts at bar differ significantly from those found sufficient to establish a "rolling easement" in *Feinman*. Here, unlike *Feinman*, there is no easement over the plaintiffs' lots upon which to apply the "rolling easement" concept. Here, the public right-of-way ran along and upon a dedicated public roadway, not across the plaintiffs' private property. In *Feinman*, the landowner held riparian property that was subject to an easement that ran along the beach. To the extent accretions caused the beach to migrate seaward, the owner would benefit because the easement would shift seaward as well. Because the owner in *Feinman* would receive the benefits of any accretions, it was not inequitable that that owner also should bear the reciprocal burden of any erosion of the shoreline. In contrast, the plaintiffs' lots here were not originally riparian. They would not have benefited had the waters of Silver Lake receded and the shoreline increased.[18] Because the plaintiffs could not enjoy any benefit of accretion, there is no equitable rationale for requiring them to bear the burden of any erosion of the Silver Lake shore.[19]

In short, what the intervenor seeks here is not to "roll" an easement with which the plaintiffs' lands were originally burdened. Rather, Dewey Beach seeks the judicial creation of a new easement—one that never existed before—across the plaintiffs' lots, to replace that portion of Lake Drive claimed to be under water. *Feinman* does not require, nor has the intervenor cited any case that suggests, that the creation of an easement on adjacent property is the legally mandated result of a flooded public street. Indeed, the judicial creation of such an easement would constitute a compensable taking of private property for public use.[20]

In sum, the intervenor's argument fails factually because no easement was ever created over the plaintiffs' (or their predecessors') property, and it fails legally because creating such an easement would be tantamount to an uncompensated taking. Moreover, a principle that would cause a public roadway to shift with the migration of the shore of the adjoining body of water would be unjust and poor public policy. The rule advocated by Dewey Beach would

16. *E.g., Reybold*, 5 Harr. at 486–87.

17. *See Phillips v. Rhodes*, 48 Mass. 322 (1843)(profit à prendre which permits ingress to collect seaweed not extinguished by movement of shore).

18. *See generally* Farnham, *supra*, § 144 at 668 (land bounded by street, based on language in deed or plat, has no riparian rights).

19. *See 1.629.6 Acres of Land, supra*, 335 F.Supp. at 268 (one explanation of accretion doctrine is that "to him who sustains the burden of loss goes the benefit of gain.")

20. In *State v. Putman*, Del.Super., 552 A.2d 1247, 1252–53 (1988), a town enacted an ordinance requiring beachfront property owners to erect a revetment to prevent the erosion of a public street. After finding the ordinance void because it conflicted with a state statute, then-Judge (now Chancellor) Chandler noted in *dictum* that if enforced, the ordinance would represent an uncompensated taking: "Had South Bethany, in an effort to protect public property from the actions of the sea, entered the defendant's property and erected a revetment, either seizing the fee to the underlying ground or simply an easement to build and maintain, it is perfectly clear that compensation would be due the property owners." *Accord, Deltic Farm and Timber Co.*, 368 So.2d 1109; *see Hornsby v. State Department of Highways*, 241 La. 989, 132 So.2d 871, 873 ("[t]he legislature is powerless to establish servitudes where none already exist. To do so would constitute a taking of private property, without compensation previously made, and would be violative of the Constitution.") (citation omitted).

impose the entire burden and expense of 123 years of erosion of the riparian parcel upon the adjacent property owners, who would have no right to enter the riparian parcel to prevent its erosion in order to protect their property. At the same time, the true riparian owners (the public) would have no incentive to prevent or mitigate erosion, because the public would lose nothing—the roadway would simply migrate from the shoreline at the same rate at which the erosion progressed.

\* \* \* \* \* \*

For these reasons, the Court concludes that the location of Lake Drive did not, as a legal matter, move with the ebbs and flows of Silver Lake. That location was, and still is, as fixed by the 1876 plot plan. That conclusion does not conclude the analysis, however. It only raises a second, factual issue that the Court must now address: where is that location, and is it above ground or under water?

**B. The Present Location of Lake Drive**

■ To determine where Lake Drive is currently located, the Court must first ascertain where Lake Drive was located at the time it was established in 1876. The only available evidence bearing on that issue is the 1876 plot plan which, the intervenors contend, is illegible and impossible to scale with reference to fixed monuments, and is a totally unsuitable basis to fix the 1876 shoreline location. I cannot agree. Although the 1876 plot plan is old and worn, it is still legible, it is drawn to scale, and it displays courses, distances, and fixed monuments. All these attributes establish the plot plan's reliability for present purposes.

This Court credits the testimony and conclusion of the plaintiffs' two expert witness surveyors, that the 1876 plot plan is scaled and that the 1876 location of the shoreline and Lake Drive can reliably be determined as a result of scaling derived

from that plot plan. Both of plaintiffs' expert surveyors, Messrs. Jay Wingate and William Dailey, have ample experience in the Southern Delaware geographical area, and both are highly skilled in the methods they employed to arrive at their opinions. They identified four criteria to determine a survey's reliability, namely: (1) Is the survey legible; (2) Is it drawn to scale; (3) Does it display courses and distances; and (4) Does it display fixed monuments? The plaintiffs' expert witnesses answered each question in the affirmative. Both witnesses testified that the plot plan is legible for the purposes of this case, and that it was drawn to scale. And, Mr. Wingate persuasively testified that the 1876 plot plan depicts several identifiable monuments.

Mr. Dailey scaled the 1876 plot plan to fix the original location of Lake Drive and of the Silver Lake shoreline. He testified that several blocks and lots' are depicted across the bottom portion of that plot plan. The blocks are shown as being fifty feet wide. Based on his knowledge that a block is six-hundred feet long, Mr. Dailey determined that a six-hundred feet block represented an inch and a half on the 1876 plot, and from that measurement he concluded that the scale of the 1876 plot plan is one inch equals four hundred feet.[21] On that basis, Mr. Dailey scaled a distance from the southerly side of Chesapeake Street to the edge of Silver Lake, and continued to scale across the plaintiffs' four lot lines to derive the shape or contour of Silver Lake as it existed in 1876. Mr. Dailey then checked his scaled dimensions against photographs of that area to confirm the accuracy of his scaled measurements against the known widths and depths of the lots. Lastly, Mr. Dailey determined the 1876 location of Lake Drive by drawing Lake Drive parallel to, but fifty feet away from, the edge of Silver Lake.

---

**21.** The roads are each fifty feet wide, and two hundred feet separate the roads on the 1876 plot plan.

Mr. Wingate's testimony confirmed the reliability of the 1876 plot plan upon which Mr. Dailey's scaling was based. Mr. Wingate testified that the blocks are laid out in multiples of two hundred feet and that the streets are laid out in multiples of fifty feet. After comparing the 1876 plot plan with the 1926 and 1936 plot plans of the same area and also with other records in his possession, Mr. Wingate concluded that the dimensions of the lots located south of Silver Lake, and upon which he had placed monuments and pipes to mark the property lines, were consistent with the street locations shown on the 1876 plot plan.

Satisfied that the 1876 location of Lake Drive has been reliably established, I turn to the second factual issue, which is where Lake Drive is located today, specifically, whether Lake Drive is under water or on dry land. The persuasive evidence bearing on this question includes the testimony of Mr. Wingate and of Mr. Jeffrey Bross from Duffield Associates, Incorporated, an environmental engineering firm specializing in water resources ("Duffield"), as well as the photographic evidence of the movement of Silver Lake's shoreline over decades of time.

Mr. Wingate personally surveyed the relevant area on three separate occasions before this dispute arose—in 1970, in 1979, and in 1989. Each time he concluded that Lake Drive was under water. While performing the 1970 physical survey, Mr. Wingate noted that he could not find Lake Drive. To discover why not, Mr. Wingate then reviewed the available plots of the area, and scaled the distances from the north side of Chesapeake Street as shown on those particular plots. By this process he found the answer—over one hundred feet of water had covered what had previously been the southerly edge of the proposed Lake Drive. Accordingly, Mr. Wingate noted on his 1970 survey and on his 1979 survey, as follows:

Old Plots Rehoboth City & Its Successor, Rehoboth–By–The–Sea, Indicate A

Proposed Road Around The Shoreline Silver Lake. To The Best Our Knowledge, Such A Road Was Never Opened. Furthermore, From Scaled Distances On The Plots, We Find Today This Road Would Be Located Approximately 100′ Into The Waters Of Silver Lake At This Location.[22]

To show the (photographic) progression over time of Silver Lake's shoreline, Duffield used photographs of the Silver Lake area taken in 1938, 1960, 1962, 1968, and 1991. Those photographs show that Lake Drive was dedicated fifty feet from the 1876 shoreline location, that the waters of the Lake eventually covered Lake Drive, and that the present location of Lake Drive is under water.

To meaningfully compare the aerial photographs taken in 1938, 1960, 1968, and 1991, Duffield scaled them to size by enlarging some and reducing others, in order to arrive at a common scale for all. Duffield then abstracted the street grid systems of Rehoboth Beach and Dewey Beach and superimposed the resulting grid lines onto the photographs. The photographs with the superimposed grid systems were then scanned for analysis by computer. For each photograph the shorelines were traced and the contours of the shorelines were compared. Duffield also scanned the 1996 shoreline as plotted by Mr. Dailey, and found that the 1996 shoreline closely corresponded to the 1991 aerial photograph.

Lastly, to verify accuracy, Duffield scanned the Dailey survey into its computer system and matched that survey to the same scale as the photographs. Duffield then superimposed the original 1876 shoreline upon all of the photographs. The resulting product shows unmistakenly that the original 1876 shoreline is to the north of the shoreline as it existed in 1938, 1960, 1968, and 1991, and that since 1938, Lake Drive has been under water. Mr. Dailey's survey also shows that the current position

22. Mr. Wingate's 1989 survey contains a simi- lar note.

of Lake Drive is almost exactly the same as the 1991 photograph. Thus, Lake Drive remains under water today.

## IV. CONCLUSION

The overwhelming preponderance of credible evidence shows, and the Court therefore determines, that from and after 1876 the Silver Lake shoreline has moved and that since at least 1938 Lake Drive has been, and it presently is, under water. Counsel shall submit a form of order that implements the rulings and findings in this Opinion.